711 F.2d 1006
 19 ERC 1682
 Charles A. PIROLO, individually, and d/b/a Suncoast
Equipment Leasing, Suncoast Pilots Club, Inc., and
Clearwater Aircraft, Inc.,
Plaintiffs-Appellants, Cross- Appellees,
v.
CITY OF CLEARWATER, a Florida Municipal Corporation;
Charles F. LeCher, Mayor- Commissioner, et al.,
Defendants-Appellees, Cross-Appellants.
 No. 82-5322.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 12, 1983.
Rehearing and Rehearing En Banc Denied Nov. 4, 1983.
 
 Evans W. North, Washington, D.C., John N. Samaha, St. Petersburg, Fla., for plaintiffs-appellants, cross-appellees.
 Thomas A. Bustin, City Atty., F. Wallace Pope, Jr., Elizabeth J. Daniels, Clearwater, Fla., for defendants-appellees, cross-appellants.
 Appeals from the United States District Court for the Middle District of Florida.
 Before RONEY and CLARK, Circuit Judges, and GIBSON*, Senior Circuit Judge.
 
 WILLIAM J. CASTAGNA, District Judge:
 
 1
 This appeal involves the constitutionality of two airport regulation ordinances enacted by the City of Clearwater and a claim for damages brought by the airport's operator. The district court ruled that the ordinances--one prohibiting night operations and the other prescribing air traffic patterns--were preempted by federal regulations and therefore violated the supremacy clause. U.S. Const. art. VI, cl. 2. However, the court denied the operator's claim for damages under 42 U.S.C. § 1983 (1976). The operator appeals and the city cross-appeals. We affirm the judgment of the district court in all respects.
 
 I. Facts
 
 2
 In 1970 the City of Clearwater entered into a thirty-year lease-contract with a corporation called Clearwater Golf-Park, Inc. for the operation of an airport and golf course. The lease did not impose restrictions on hours of operation or air traffic patterns. Later in 1970 Clearwater Golf-Park, Inc. entered into a thirty-year sublease with Clearwater Air Park, Inc. (which later changed its name to Clearwater Aircraft) for the operation of the airport. The sublease, like the lease, did not impose restrictions on the hours of operation or air traffic patterns, and also provided for a "lighted runway for takeoffs and landings at night." The sublease said it was subject to the lease.
 
 
 3
 In 1974 the lease was amended to prohibit night flying unless the city gave its consent, but Clearwater Aircraft was not a party to the amendment. Shortly after the lease was amended, the city enacted an ordinance prohibiting night flying. In 1975 the ordinance was ruled unconstitutional by the Circuit Court of Pinellas County, Florida. Plaintiff Charles Pirolo bought the stock of Clearwater Aircraft in 1977. In 1979 the city enacted a second curfew ordinance, this one slightly different from the first. In 1980 the city passed an ordinance requiring certain air traffic patterns for takeoffs and landings. Both ordinances were enacted after due public notice and public hearings.
 
 
 4
 Later in 1980 Pirolo, individually and doing business as Clearwater Aircraft and other corporations, brought this action against the city and its commissioners seeking to enjoin enforcement of the ordinances and seeking damages against the city and its commissioners under § 1983. After various motions, memoranda, interrogatories, and affidavits were filed, the district court granted partial summary judgment for Pirolo, finding the ordinances preempted by federal law and therefore in violation of the supremacy clause. The court also granted defendants' Motion to Dismiss and/or for Summary Judgment on Pirolo's § 1983 claim on the basis that federal courts cannot provide a remedy under § 1983 for violations of the supremacy clause. Pirolo moved for reconsideration, arguing that his § 1983 claim was based in part on a deprivation of property and/or liberty without due process claim under the fourteenth amendment. The district court denied the motion for reconsideration without explanation.
 
 II. Constitutionality of the Ordinances
 
 5
 The city concedes that under City of Burbank v. Lockheed Air Terminal, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), the city's ordinances would be preempted by federal regulations if they were enacted pursuant to the city's police power. In Burbank, the Supreme Court invalidated ordinances which placed a curfew on jet flights on the basis that pervasive federal regulation gave the Federal Aviation Administration and the Environmental Protection Agency exclusive responsibility for noise control at airports. Id. at 638-40, 93 S.Ct. at 1862-63. Both ordinances passed by the City of Clearwater are clearly noise control ordinances. The curfew ordinance is directly controlled by Burbank and the air traffic ordinance states that it was designed to control noise. Burbank allowed for one possible exception to this rule in situations where a city is the proprietor of the airport. The Supreme Court stated in a footnote: "We do not consider here what limits, if any, apply to a municipality as a proprietor." Id. at 635-36 n. 14, 93 S.Ct. at 1860-1861 n. 14. The Supreme Court did not decide what power a city has as proprietor because the City of Burbank had imposed the curfew pursuant to its police power, not as the proprietor. Id. The City of Burbank was neither the owner nor the operator of the airport. Lockheed Air Terminal v. City of Burbank, 457 F.2d 667, 668 (9th Cir.1972), aff'd, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973).
 
 
 6
 The district court in the instant case concluded that the city is not a proprietor of the airport, and the city argues that summary judgment was inappropriate on this issue. Although it is not entirely clear whether the City of Clearwater should be called the proprietor, the district court was correct in concluding that the city did not have the proprietary power to impose the restrictions. The only basis other than proprietary power for enactment of the ordinances was the police power, and as exercises of the police power Burbank requires that the ordinances be found unconstitutional as violations of the supremacy clause.
 
 
 7
 The City of Clearwater states that it is subject to potential liability for excessive noise, and therefore it should be able to enact ordinances under a proprietor exception. Some courts have indicated that the determining factor in whether regulations are within a proprietor exception is potential liability. San Diego Unified Port District v. Gianturco, 651 F.2d 1306, 1316-17 (9th Cir.1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982); British Airways Board v. Port Authority of New York, 558 F.2d 75, 83 (2d Cir.1977). These courts relied on Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), where the Supreme Court held the county liable in an inverse condemnation action in which the county was the owner and operator of the airport. The city argues that its status as owner and the entity with the power to acquire air easements subjects it to potential liability.
 
 
 8
 However, before deciding whether a city's potential liability justifies the exercise of its proprietary power to regulate (rather than its police power), we must determine whether the city in fact possessed a proprietary power to regulate. In this case the city contracted away its right to impose the desired restrictions. Therefore, we need not decide whether the proprietor exception is applicable and whether the city faces potential liability for excessive noise.[1]
 
 
 9
 An examination of the Burbank footnote shows that the Supreme Court did not intend to give extraordinary powers to municipal airport proprietors. In explaining the derivation of the possible proprietor exception, the Supreme Court quoted from a letter from the Secretary of Transportation to the Senate Commerce Committee which was considering noise abatement amendments to the Federal Aviation Act. The quoted portion read:
 
 
 10
 [T]he proposed legislation will not affect the rights of a State or local public agency, as the proprietor of an airport, from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners acting as proprietors can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory.
 
 
 11
 411 U.S. at 635-36 n. 14, 93 S.Ct. at 1860-1861 n. 14, quoting S.Rep. No. 1353, 90th Cong., 2d Sess. (1968) U.S.Code Cong. & Admin.News 1968, pp. 2688, 2694 (Court's emphasis).
 
 
 12
 Black's Law Dictionary defines a proprietor as: "One who has the legal right or exclusive title to anything. In many instances it is synonymous with owner." Black's Law Dictionary, 1098 (rev. 5th ed. 1979). The footnote suggested that a city as owner or proprietor may be able to exercise its proprietary powers in situations where an exercise of the police power would be preempted. The Supreme Court emphasized the distinction between proprietary and police powers by saying in the footnote: "[W]e are concerned here not with an ordinance imposed by the City of Burbank as 'proprietor' of the airport, but with the exercise of police power." 411 U.S. at 635-36 n. 14, 93 S.Ct. at 1860-1861 n. 14. The Court did not suggest that if the city is a proprietor, it can impose restrictions outside of its proprietary power. The only case we have found in which airport noise restrictions were upheld under the proprietor exception dealt with a city that was both owner and operator of the airport and had not contracted away the right to impose noise restrictions. Santa Monica Airport Ass'n v. City of Santa Monica, 659 F.2d 100 (9th Cir.1981).
 
 
 13
 A review of the lease documents shows the district court was correct in concluding that the city had contracted away the right to impose the noise restrictions. The city executed a 30-year lease in 1970 and approved a sublease which had no curfews or air traffic restrictions. The lease was amended in 1974 to permit the desired restrictions, but the sublessor was not a party to the amendment and therefore it is not binding on Pirolo. The fact that the amendment was made before Pirolo bought the stock of the sublessor is irrelevant because the purchase was not an implicit agreement by Pirolo to accept restrictions that the sublessor was not bound to follow. Although the lease has provisions for its revocation if the airport is operated in a manner inconsistent with the public interest, it also provided for arbitration in case of dispute on this matter and the city did not invoke these provisions.
 
 
 14
 The city apparently misinterpreted Burbank to give it power to ignore contract obligations if it faced potential liability for excessive noise. The only basis for the ordinances is the police power, and they are clearly preempted by federal law.
 
 III. Section 1983 Claim
 
 15
 Pirolo appeals the district court's granting of the city's Motion to Dismiss and/or for Summary Judgment on the § 1983 claim. The district court based its decision on the fact that federal courts do not have jurisdiction to hear § 1983 claims based on violations of the supremacy clause. Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 615, 99 S.Ct. 1905, 1914, 60 L.Ed.2d 508 (1979). Pirolo does not dispute this point, but he argues that part of his § 1983 claim was based on the due process clause of the fourteenth amendment. In the district court, he made general arguments about "impairment of contract" but here argues that the defendants' conduct deprived him of liberty and/or property without due process. Pirolo claims he suffered a substantial decrease in business, which violated three constitutional rights: (1) the right to follow a chosen profession free from unreasonable interference, (2) the right to enjoy property without sustaining unlawful deprivation thereof, and (3) the right to enjoy the goodwill of a business. Pirolo argues that these rights were violated by the city enacting and enforcing the ordinances, by the commissioners' making disparaging statements during the course of negotiations for the city to buy Pirolo's property, and by the city's failure to trim trees near the airport.[2]
 
 
 16
 There is some initial appeal to Pirolo's argument that he is entitled to damages resulting from unconstitutional ordinances. However, the cause of the unconstitutionality of the ordinances is not of the type for which federal courts can provide a § 1983 remedy. Indeed, Pirolo has never argued that the ordinances were invalid because they violated the fourteenth amendment or were outside the city's police power to enact laws for the public welfare. Pirolo's § 1983 claim is based on a constitutional provision (the due process clause) different from the provision that made the noise control ordinances unconstitutional (the supremacy clause). Therefore it should not be surprising that Pirolo's § 1983 claim must fall.
 
 
 17
 There is no doubt that the enforcement of the city's ordinances harmed Pirolo's property. However, the enforcement of almost all regulations harms a person's property interests. The due process clause is not violated merely because a law has an adverse effect on one's property. E.g., Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940 (1934); 16A Am Jur 2d Constitutional Law, §§ 393, 397. Pirolo made no allegations that the ordinances were arbitrary, unreasonable, or otherwise outside the scope of the city's police power, and therefore they were not prohibited by the due process clause. The sole cause of the unconstitutionality was the supremacy clause. Therefore Pirolo is not entitled to a § 1983 remedy for enforcement of the ordinances.
 
 
 18
 Pirolo's allegations that fundamental constitutional rights are involved does not alter our analysis. As to the right to follow a profession free from unreasonable interference, there has not been an infringement of this right. The case discussing this right as a property or liberty interest is Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), where the Supreme Court stated: "[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable government interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." Id. at 492, 79 S.Ct. at 1411. In Greene the federal government revoked the security clearance of the plaintiff, an aeronautical engineer employed by a private manufacturer which produced goods for the armed services. As a result he was fired. After being fired, he could not get a job as an aeronautical engineer, and as the Supreme Court noted, "[F]or all practical purposes that field of endeavor is now closed to him." Id. at 476, 79 S.Ct. at 1403.
 
 
 19
 Greene is not on point because that case dealt with a person who was banned from engaging in his profession with any employer. Under the ordinances, Pirolo could have continued in his profession even if his profession is construed as narrowly as that of airport operator, either at another location or under the restrictions imposed. Also, the property right described by Pirolo prohibits only unreasonable restrictions, and the city's restrictions were not unreasonable; they were simply preempted.[3]
 
 
 20
 As to the "right to enjoy property without unlawful deprivation," Pirolo relies on Lynch v. Household Finance Corp., 405 U.S. 538, 552, 92 S.Ct. 1113, 1121, 31 L.Ed.2d 424 (1972). The Court in that case found that deprivation of property rights as well as personal rights are within the scope of § 1983. The Court did not define a particular property right; it merely described circumstances under which a person has a right to due process before the state deprives him of his property. Therefore, Lynch does not create any property interest that could have been violated.
 
 
 21
 Pirolo also complains of conduct of the city and its commissioners other than in enforcement of the ordinances. He claims that the commissioners violated his right to the goodwill of a business by making disparaging statements during negotiations for the purchase of his lease. We need not determine the contours of the right to the goodwill of a business because Pirolo declined to provide any substantiation to the charge that disparaging statements were made. Pirolo refused to answer interrogatories asking him to identify the disparaging statements. The lack of any substantiation made summary judgment appropriate.
 
 
 22
 Pirolo also argues that the city failed to trim trees near the airport, in contravention of state law. Even if Pirolo is correct in saying state law required the city to trim the trees, the failure to follow state law does not make out a federal claim.
 
 
 23
 Pirolo also claims in his brief he was harmed by attempted enforcement of the curfew ordinance sometime in 1977 or thereafter, with the inference being that the attempted enforcement was pursuant to the 1974 ordinance which had been declared unconstitutional. However, nowhere in the complaint, interrogatories, memoranda, or at the hearing on the motions for summary judgment was there any suggestion that the city attempted to enforce the 1974 night curfew ordinance after it was declared unconstitutional. The only suggestion for that claim is in an affidavit by Doris Pirolo which states:
 
 
 24
 [A]fter plaintiffs took over the operation of the airport during 1977, night flying operations were being conducted. The pilots were permitted to operate in and out of the airport during the nighttime for extensive periods of time. Then, without warning, the police appeared at the airport, started to arrest pilots for infractions of the curfew law.
 
 
 25
 An affidavit can be used to support a claim, but not to raise issues for the first (and only) time. Also the affidavit does not say that the arrests preceded enactment of the 1979 curfew ordinance; in fact it states that "for extensive periods of time" after the purchase of the airport in 1977 night flying was permitted. Since the only arrests mentioned in the Amended Complaint occurred pursuant to the later ordinances, it is reasonable to assume that the affiant was referring to these arrests.
 
 
 26
 Finally, Pirolo argues the ordinances effected an inverse condemnation of his property. There is absolutely no suggestion of an inverse condemnation argument, directly or indirectly, in the district court record. Pirolo argues he raised an inverse condemnation issue by referring to the city's taking of property without due process. Pirolo apparently confuses the due process and just compensation clauses of the fifth amendment. The general rule is that we will not consider an issue raised for the first time on appeal. Jerguson v. Blue Dot Investment, Inc., 659 F.2d 31, 35 (5th Cir.1981), cert. denied, 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982). There is no reason to deviate from this rule in this case.
 
 
 27
 Our primary disagreement with the dissent concerns whether Pirolo has alleged a due process clause violation. As mentioned above the ordinances were clearly related to the public welfare and were not rendered arbitrary and unreasonable simply because they were preempted. See Maher v. City of New Orleans, 516 F.2d 1051, 1057, 1058-59 (5th Cir.1975), cert. denied, 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830 (1976). We do not believe that the ordinances violated due process by specifically referring to Pirolo's airport because Pirolo apparently had the only airport in town.
 
 
 28
 In support of its argument that Pirolo has stated a due process claim, the dissent points to Pirolo's allegation of the repetitious passage of unconstitutional ordinance, the harassment of pilots, and the failure to afford the airport duties as required by state statute. The dissent relies on Reed v. Village of Shorewood, 704 F.2d 943 (7th Cir.1983), a recent Seventh Circuit opinion holding that § 1983 plaintiffs, owners of a licensed liquor business, had sufficiently stated a cognizable due process claim by alleging that defendants, local municipal officials, had virtually destroyed the value of plaintiffs' licensed business "through harassment of customers and employees and relentless baseless prosecution ...." Id. at 749.
 
 
 29
 We cannot agree with the dissent that the allegations in this case are comparable to those found sufficient to state a due process claim in Reed.
 
 
 30
 First, we cannot agree that a due process claim can be predicated on an allegation that the city passed an unconstitutional ordinance. The second curfew ordinance, enacted after due public notice and public hearings, clearly attempted to rely on the proprietorship exception to the general rule of preemption for airport noise control. The fact that the city misinterpreted the scope of the exception does not mean the ordinance was enacted in bad faith. And an attempt to regulate a business for the benefit of the public welfare, knowing such a regulation will have an adverse economic impact on the business, has long been seen as being within a city's legitimate police power. Maher, 516 F.2d at 1059. There is no suggestion by Pirolo that the city had any concern other than the public welfare.[4] Furthermore, it is far from clear that Pirolo would have a cognizable due process claim even if the city passed the second night ordinance, knowing the ordinance to be violative of the supremacy clause. To hold that a plaintiff has a § 1983 claim for intentional violation of the supremacy clause would appear to run afoul of Chapman.
 
 
 31
 Second, the city's alleged harassment of pilots by arresting them for violations of an invalid curfew law is similarly insufficient to state a due process claim. As mentioned above, there was no allegation that the city attempted to make any arrests pursuant to the 1974 curfew ordinance declared unconstitutional. And arrests made under the invalid 1979 ordinance were predicated upon the city's misinterpretation of the scope of the proprietorship exception to the supremacy clause. We cannot agree that the enforcement of an ordinance later found to be violative of the supremacy clause gives rise to a due process claim under § 1983. See Chapman, 441 U.S. at 615, 99 S.Ct. at 1914.
 
 
 32
 Third, the city's alleged failure to discharge their statutory duty of trimming the trees near the airport may give rise to a state claim but not a federal claim. And, unlike the case in Reed, we cannot say that this action on the part of the city, even if done in bad faith as alleged, had the effect of destroying the value of Pirolo's business.
 
 
 33
 The dissent also urges that Pirolo's case should be treated as a just compensation clause claim. The two Fifth Circuit cases the dissent says are controlling are primarily just compensation cases. Hernandez v. City of Lafayette, 643 F.2d 1188 (5th Cir.1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982), relied exclusively on the just compensation clause. Id. at 1197-1201. The other case, Wheeler v. City of Pleasant Grove, 664 F.2d 99 (5th Cir.1981), cert. denied, 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982), relied in part on the just compensation clause. However, as explained at p. 4408, Pirolo never made a just compensation argument in the district court. The dissent does not give any reason for departing from the general rule of not allowing a party to raise an issue for the first time on appeal. It would be unfair to defendants to subject them to protracted litigation because of Pirolo's failure to argue the just compensation clause in the district court.
 
 
 34
 The court in Wheeler did rely in part on the due process clause. The court held that the city's revocation of a building permit "bore no substantial relationship to legitimate concerns for health, safety, welfare, or the general well-being of the community" and the findings by the trial court indicated that the action was a confiscatory measure. Id. However, we do not think the noise control ordinances can reasonably be called unrelated to the public welfare. In fact, neither the dissent nor Pirolo suggest that the noise control ordinances were unrelated to the public welfare. Wheeler, therefore, is distinguishable.
 
 
 35
 The dissent finally appears to suggest that the city impaired its contractual obligations to Pirolo. However, Pirolo has never argued that the impairment of contract clause, U.S. Const. art. 1, § 10, cl. 1, was violated.
 
 
 36
 In summary, we find the ordinances violate the supremacy clause, but there is not a § 1983 remedy for this violation. The city did not violate the due process clause because the noise control ordinances promoted the public welfare. We do not consider the just compensation clause claim or an impairment of contract clause claim because such claims were not made to the district court; the latter was not even argued to this court.
 
 
 37
 It is insufficient for Pirolo to spew forth various allegations of bad acts by defendants and say that somehow the due process clause must have been violated. Instead, we have analyzed the specific relevant constitutional provisions and conclude that Pirolo is left without a § 1983 remedy because of Chapman and Pirolo's own failure to present claims in the district court.
 
 
 38
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 39
 CLARK, Circuit Judge, concurring in part and dissenting in part:
 
 
 40
 I concur in affirming the district court's ruling that the city ordinances regulating air traffic were unconstitutional. I disagree with the holding that appellants have no claim under 42 U.S.C.A. sec. 1983 (1981).
 
 
 41
 The district court should not have granted summary judgment on appellants' section 1983 claims. There remain issues of material fact as to whether the city used its police powers in violation of due process of law to impair its contractual obligations and to deprive its lessee of peaceful enjoyment of a property right. These are issues properly raised under section 1983.
 
 
 42
 Despite statements to the contrary by the majority, I find that the appellants' allegations are more than sufficient for stating their section 1983 claims. More important, the record indicates that, at a trial now denied them, appellants could prove their claims. Appellants asserted that their injuries "resulted in whole or in part from the enactment ... of a curfew that was both arbitrary and unreasonable."[1] Further, they asserted that the city commissioners,
 
 
 43
 willfully and deliberately acted in their official capacities to harm the plaintiffs [through wrongdoings extending] from the taking of improper legislative action to impair vested contractual rights to which the city was a party ... to the acting in concert to deprive the airport operators from enjoying the full use and benefit of the airport.[2]
 
 
 44
 In their Amended Complaint, the appellants alleged, "The Defendants individually and/or collectively, engaged in acts indicative of 'bad faith' proximately resulting in damage to Plaintiffs in the past and continuing in the future," and then went on to list episodes evidencing bad faith.
 
 
 45
 This list indicates a pattern of suspicious activity by the city. The city, under the airport lease, had only two legal means of redress to the nighttime takeoffs and landings. These two were rescission and arbitration. Appellants alleged that the city neglected and delayed these remedies and, in so doing, also unreasonably delayed the city's purchase of the airport leasehold. Such a purchase would have been the proper course for the city, given its limited legal options. Beyond the drawing out of negotiations for purchase, the list goes on: passing Ordinances Nos. 1896 and 2064, which the city had reason to believe were unconstitutional because a state court had earlier declared a similar ordinance, No. 1516, to be so, and which were to result in complex court actions; arresting pilots pursuant to the suspect ordinances; and refusing to cut trees along a flight path as required by Florida aeronautics law. These actions, as well as others, effectively lessened the leasehold's value, to the city's eventual illicit advantage.
 
 
 46
 The majority dismisses the appellants' allegation as to the city's bad faith. Yet, following the majority's affirmation of the district court's summary judgment, the question of the possibility of the city's bad faith lingers heavily. Appellants should have been afforded the opportunity to prove it.
 
 
 47
 The facts stated by the majority call for emphasis and elaboration. As those facts suggest, the city has tried for a long time to stop nighttime takeoffs and landings at the airport in question. On March 6, 1974, the city and Clearwater Golf Park amended their lease to prohibit night flying unless the city consented. (However, it is important to note that Clearwater Aircraft--Clearwater Golf Club's sublessee which Pirolo was later to buy in 1977--was not a party to the amendment, and so, the amendment did not reach appellants.) Next, on June 17, 1974, the city enacted Ordinance No. 1516, prohibiting nighttime takeoffs and landings. The preamble to this ordinance noted that the city had received many complaints about nighttime flying.
 
 
 48
 In holding the ordinance unconstitutional in 1975, the Circuit Court for Pinellas County noted "comments and activities of some City Commissioners [which] have not been in the category of good faith honoring all the City commitments to the lessee." Clearwater Golf Park, Inc. v. The City of Clearwater, Circuit Civil No. 64-5779-16, (Pinellas Cty., Fla., Cir.Ct.1975) (Record). Thus, even before the Pirolos' purchase of Clearwater Aircraft, the city's enactment of the 1979 curfew ordinances, or the state court's 1975 holding regarding the 1974 ordinance, there were city commissioners making statements and performing activities that were not "in the category of good faith."
 
 
 49
 The majority suggests that the second curfew ordinance, with its specific mention of the appellants' lease and rights, was perhaps a simple misinterpretation of the scope of federal authority in airport regulation. Yet, the Pinellas County Criminal Division Court suggested otherwise when in 1980--before the filing of this federal action--it dismissed charges against Thomas Kersey, apparently a nighttime pilot, charged under that second ordinance. State of Florida v. Thomas G. Kersey, No. CTC8002494MOANO (Pinellas Cty., Fla., Ct.Crim.Div.1980) (Record). The county court said:
 
 
 50
 The City of Clearwater is trying by ordinance to supersede something they failed to do by contract. The City had delegated or limited a proprietary interest by contract, and thereafter by governmental power is attempting to make a petty crime the use of a facility in a way which is considered part of the operation of a public airpark. This is governmental interference into operation of a valid contract and it is also a "taking" of a property right without due process of law.
 
 
 51
 Among the congressional aims in passing the legislation now embodied in section 1983 was that of providing a federal remedy where the state remedy, although adequate in theory, was not available in practice. See Monroe v. Pape, 365 U.S. 167, 173-74, 81 S.Ct. 473, 476-77, 5 L.Ed.2d 492, 496-98 (1961). In light of this aim, it should be noted that the dismissal of charges against Kersey was reversed by the Circuit Court for Pinellas County, the court summarily stating, "The City of Clearwater is not preempted by federal law in this matter and appellee is without standing to contest the validity of the subject ordinance." State of Florida v. Thomas G. Kersey, Case No. 80-7389 (Pinellas Cty., Fla., Cir.Ct.1981) (Record). Similarly, appellees, in asserting the ordinances' constitutionality during the brief hearing before the district court, noted yet another local court decision, "Judge Catherine Harlan's Order showing a denial of a barrage of attacks on the ordinance on the theories that they were violative of the preemption doctrine, that they exceeded the City police power, that they violated the commerce clause, and a host of other allegations, all of which were denied by that ruling [sic]." (Transcript, p. 8). Thus, concern about the adequacy of state remedies was significant in the formation of my belief that appellants' issues fall within section 1983 jurisdiction.
 
 
 52
 Insofar as the appellants assert that the city violated the due process clause by depriving them of their property, the present case has much in common with Reed v. Village of Shorewood, 704 F.2d 943 (7th Cir.1983). Like the present case, the district court in Reed dismissed a suit for damages under section 1983 on the defendants' motion for summary judgment. However, unlike the present case, the district court's dismissal in Reed was reversed by a full panel of the circuit court.
 
 
 53
 The plaintiffs in Reed owned a bar and alleged that defendants--a police officer, the police chief, village officials and the village itself--"interfered with and eventually destroyed their business, in violation of the due process clause of the Fourteenth Amendment." 704 F.2d at 947. In 1976, the village issued the plaintiffs a Class A liquor license, allowing them to provide live entertainment along with liquor. Although the license expired after one year, the village renewed it for each of the succeeding three years. However, in 1979 the defendants began to arrest the plaintiffs' customers and employees on allegedly baseless charges, to demand proof of age from customers who were apparently quite obviously beyond the minimum drinking age, and to bring proceedings to revoke the Class A license. Defendant Talaga, who served as both mayor and local liquor control commissioner, first suspended the plaintiffs' license for 30 days for alleged infractions of the village's liquor control ordinance. On appeal, the Illinois Liquor Control Commission reduced the suspension to five days. However, next the village board of trustees (also defendants) passed an ordinance reducing the number of Class A licenses in the village from four to three, and then informed plaintiffs that the village would not renew the license for 1980. On appeal, the Illinois Liquor Control Commission overruled the village. The commission granted the plaintiffs a stay enabling their continued operation, and held that they were entitled to a hearing, before the village decided to revoke the license. On remand, the village held no hearing, but instead revoked the license. The state commission reversed the revocation. In 1981, the defendants again refused to renew the plaintiffs' license, again without a hearing and again reversed by the state commission. When the exasperated plaintiffs finally attempted to sell their business, the defendants interfered. Eventually, the plaintiffs shut down and surrendered their license. The plaintiffs attributed "defendants' animosity to the fact that the live entertainment in the bar was provided by a rock and roll band." 704 F.2d at 948.
 
 
 54
 As Judge Posner noted in his opinion, the plaintiffs' first amendment claim, regarding suppression of their rock and roll music, "is separate from the plaintiffs' claim to have been deprived of property." 704 F.2d at 949.
 
 
 55
 Having determined that the liquor license was property,[3] the court went on to consider the issue of "whether the defendants could be found to have deprived the plaintiffs of their property rights." 704 F.2d at 949. Judge Posner wrote:
 
 
 56
 The defendants never succeeded in taking away the plaintiffs' license either by revocation or nonrenewal; their efforts to do so were thwarted by the Illinois Liquor Control Commission; and though the brief suspensions [the five-day suspension that went into effect after the plaintiffs had been accorded due process by the state liquor commission and a three-hour closing as to which the plaintiffs had a right to a subsequent hearing] were deprivations, see North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 606, 95 S.Ct. 719, 722, 42 L.Ed.2d 751 (1975), they were not denials of due process. But "deprive" in the due process clause does not mean "destroy." If the state prevents you from entering your house it deprives you of your property right even if the fee simple remains securely yours. A property right is not bare title, but the right to exclusive use and enjoyment. So if it is true as alleged that through harassment of customers and employees and relentless, baseless prosecutions the defendants destroyed the value of the plaintiffs' licensed business and forced them ultimately to give up their Class A license, the plaintiffs were deprived of their property right in the license even though the license was never actually revoked.
 
 
 57
 The principle is familiar from the related area of takings of property that are subject to the just compensation clause of the Fifth Amendment. If government makes your house uninhabitable, that is a taking of your property even if you retain a clear title.... The principle applies equally to deprivations as distinct from takings (permissible if compensated) of property ...--and must, or state officials could with impunity destroy property rights in detail.
 
 
 58
 704 F.2d at 949 (emphasis added; citations omitted). In considering the liability of the village itself, Judge Posner wrote:
 
 
 59
 The plaintiffs contend that interference with their business was a policy orchestrated at the highest level of government in the Village of Shorewood: If so--a matter to be explored by the district court on remand--the Village would be liable.
 
 
 60
 704 F.2d at 953. In the present case, the Pirolos contended that interference with their airport was a policy orchestrated by Clearwater's highest officials. This interference, as in Reed, is a matter to be further explored by the district court. If it is true as alleged that through harassment of pilots who were the Pirolos' customers, through the repetitious passage of unconstitutional ordinances and through the failure to afford the airport duties designated by statute, the city of Clearwater destroyed the value of the airport leasehold, the city of Clearwater deprived the Pirolos of their property right. Although the leasehold in the present case retained some value, the enactment of the ordinance cut it drastically, according to appellants' allegations. Traffic decreased from 86,000 operations in 1979 to 30,000 in 1980; sales and business activities were reduced 50% and continue to decline. This strongly suggests a taking for which an action for damages under sec. 1983 would lie. Therefore, the district court should not have granted summary judgment.
 
 
 61
 In addition to Reed, the present case has much in common with land use cases that have been before this court. Hernandez v. City of Lafayette, 643 F.2d 1188 (5th Cir. Unit A 1981); Wheeler v. City of Pleasant Grove, 664 F.2d 99 (5th Cir. Unit B 1981). These two cases focused on suspicious ordinances that severely restricted certain property owners in the use of their property. In discussing Hernandez and Wheeler, the majority seeks to make an important distinction between the due process issue which was properly raised by appellant and a just compensation issue which, the majority says, was not. The two issues cannot be so neatly set apart. Indeed, Judge Posner, in stating the above-quoted fourteenth amendment principle regarding deprivation of a property right without due process, noted, "The principle is familiar from the related area of takings of property that are subject to the just compensation clause of the Fifth Amendment." 704 F.2d at 949. Furthermore, Hernandez and Wheeler, which the majority says "are primarily just compensation cases," manuscript at 15, demonstrate the interrelationship, not the distinctness of the "two" issues. In Hernandez--the facts of which, so similar to those of the present case, I shall discuss below--this court stated:
 
 
 62
 Since the just compensation clause applies to the states through the due process clause of the fourteenth amendment, ... an action for damages will lie under sec. 1983 in favor of any person whose property is taken for public use without just compensation by a municipality through a zoning regulation that denies the owner any economically viable use thereof.
 
 
 63
 643 F.2d at 1200 (emphasis added; citations omitted); see Chicago B. & Q. R. Co. v. City of Chicago, 166 U.S. 226, 234-39, 17 S.Ct. 581, 583-85, 41 L.Ed. 979, 983-85 (1897), cited in Hernandez, 643 F.2d at 1200.
 
 
 64
 In Hernandez v. City of Lafayette, Hernandez owned 16.7 acres zoned for single family residential housing; in August 1975, he requested that the land be rezoned for a medical office complex. Shortly after his request, the city began planning a street realignment that would result in the bisection of Hernandez's acreage. In December 1975, the Lafayette City Council, by unanimous vote, introduced an ordinance embodying Hernandez's request, which the planning commission's staff had recommended. The city council postponed final approval of the ordinance several times during the early part of 1976, and eventually tabled it because of an impending council election. In January 1977, the council requested that the planning commission reconsider Hernandez's request. Following public hearings, the commission recommended that the council deny the request, which the council then did, one councilman having stated, " 'If we change zoning to another classification we are going to have to pay more money when we create the right-of-way [for the proposed street realignment].' " 643 F.2d at 1190.
 
 
 65
 In August 1977, Hernandez filed a new request with the city to zone his property for multifamily housing. This request was also delayed as the planning commission and the council waited to determine whether the street realignment would become a reality. Hernandez, in February 1978, filed suit in state court for a mandatory injunction to compel the city to change his property's zoning. Compromise seemed to be in the offing, but the mayor vetoed an ordinance to rezone the property for limited office use.
 
 
 66
 In March 1979, Hernandez filed suit under section 1983, complaining that the city delayed making a final decision on rezoning in an effort to maintain a depressed market value for his acreage, minimizing the cost to the city for his right-of-way needed in the street realignment. The district court, noting that zoning is a legislative function and that a municipality is not absolutely immune when exercising its legislative function, Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), held that, where the claimed deprivation is the result of the city's failure to act promptly (rather than its affirmative enactment of an unconstitutional law or official policy), the city is immune from suit under section 1983. On this point, this court reversed, stating, as noted above, that, since the just compensation clause applies to the states through the fourteenth amendment's due process clause, an action for damages lies under section 1983 in favor of any person whose property is taken for public use without just compensation by a municipality through a zoning regulation that denies the owner any economically viable use thereof. Although Hernandez involved the taking of nearly all the property's value, this same reasoning applies in the present case, in view of Reed and the size of the proportional loss in appellants' business.
 
 
 67
 In Wheeler v. City of Pleasant Grove, this court affirmed a district court finding that an ordinance forbidding new apartment construction was confiscatory and violative of the plaintiffs' fourteenth amendment rights to due process. In Wheeler, the plaintiffs, in August 1978, were granted a permit to build an apartment complex on land the plaintiffs had recently purchased in Pleasant Grove, Alabama. In reliance on the permit, the plaintiffs initiated preparatory work. News of the construction created a civic uproar. A referendum was held, showing overwhelming resistance to the apartment complex. The upshot of the referendum was the passage of a city ordinance prohibiting new apartment construction. This court affirmed the district court holding, finding the new ordinance a bald attempt to revoke an already authorized building permit.
 
 
 68
 The facts in the present case are quite similar to those of both Wheeler and Hernandez. The ordinances, their enforcement and the circumstances of their passage evidence the city council's unreasonableness. The city council's actions have severely decreased the value of appellants' property, a leasehold interest.
 
 
 69
 Not only is the inference strong that the City of Clearwater employed its police powers to deprive appellants of peaceful enjoyment of a property right in violation of due process of law, but it gains further strength in light of the fact that the city had special obligations as to that property--contractual obligations. Thus, the due process question is compounded by the fact that the city used its police powers to impair its contractual obligations.[4]
 
 
 70
 Finally, consideration is due Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), noted by the district court. In Parratt, the Supreme Court found that a prison inmate had not stated a claim for relief under section 1983 when he asserted that prison officials had negligently caused the loss of certain goods he had ordered by mail. The Court held that "mere negligence" did not support a section 1983 claim; that a post-deprivation state tort remedy constituted sufficient due process for an assertion that a deprivation of property occurred through negligence. The Court noted significantly, "The loss of property, although attributable to the State as action under 'color of law' is in almost all cases beyond the control of the state." 451 U.S. at 541, 101 S.Ct. at 1916, 68 L.Ed.2d at 432. Parratt's property loss "did not occur as the result of some established state procedure." 451 U.S. at 543, 101 S.Ct. at 1917, 68 L.Ed.2d at 434. In the present case, quite the contrary was true. The loss of property was wholly within the control of the city council. The deprivation occurred as a direct result of the council's activity. The council employed its law-making power unlawfully to impair the value of the airport leasehold and to deprive Pirolo of his right to use his property.
 
 
 71
 In summary, I believe that this case is controlled by Hernandez and Wheeler. However, this case is even stronger than either of those because the city's behavior was directed against a party to whom it bore contractual obligations--compounding the likelihood of the city's bad faith and the due process deprivation.
 
 
 
 *
 Honorable Floyd R. Gibson, U.S. Senior Circuit Judge, for the Eighth Circuit, sitting by designation
 
 
 [1]
 Counsel for the city informs us that it is the defendant in a state court action for excessive noise and asks us to rule that it cannot be liable if the ordinances are invalid. We leave the decision of liability to the Florida state courts
 
 
 [2]
 Pirolo's counsel did not clearly state in his brief the conduct of the city and commissioners of which he complains and how the conduct violated particular constitutional rights. We have gleaned Pirolo's arguments from the trial court record, the briefs, and oral argument, and have tried to present them in the light most favorable to Pirolo
 
 
 [3]
 Pirolo also cites United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), where the Supreme Court invalidated a statute that prohibited members of the Communist Party from working in any defense facility. The Supreme Court found the statute violated the first amendment right of association. Id. at 261, 267-68, 88 S.Ct. at 422, 425-426. The Court did not suggest that property or liberty interests were involved. Therefore this case does not support Pirolo's fourteenth amendment claim
 
 
 [4]
 In some circumstances a public welfare regulation may implicate the taking for public use without just compensation clause, see Maher, 516 F.2d at 1064-67, but Pirolo did not argue the just compensation clause in the district court
 
 
 [1]
 Supplemental Response to Defendants' Motion to Dismiss, p. 2
 
 
 [2]
 Plaintiffs' Points and Authorities, pp. 15-16
 
 
 [3]
 The leasehold interest in the present case is property. "At common law estates for years were classified as chattels real and regarded as personal property." Devore v. Lee, 158 Fla. 608, 610-612, 30 So.2d 924, 926 (1947). See 34 Fla.Jur.2d, Landlord and Tenant, sec. 5 (1983) ("The interest of a tenant in a term for years is deemed at common law to be personal property as distinguished from real estate.")
 
 
 [4]
 The majority writes, "Pirolo has never argued that the impairment of contract clause, U.S. Const. art. 1, sec. 10, p 1, was violated." Manuscript at 16. However, at the hearing on motions for summary judgment, appellants' attorney stated:
 In McGuire v. Sadler, 337 F.2d 902, which is a Fifth Circuit Court of Appeals decision [discussing jurisdiction under U.S. Const. art. 1, sec. 10, p 1], they hold that a claim founded upon impairment of contractual obligations itself is actionable under 28 U.S.C. 1331. That would cover the independent jurisdiction with respect to the impairment of contract allegation alone.
 (Transcript, p. 38). Thus, in the district court, the Pirolos expressly argued that the contract clause was violated. However, in their brief to this court, they did not refer to their contract clause argument. Nonetheless, I believe the argument is relevant, because it is a constitutional element of the case related to appellants' section 1983 claims. Furthermore, nothing like it existed in either Hernandez or Wheeler; the present case thus gains strength in comparison.