[No. S091547. Apr. 22, 2002.]

GREAT WESTERN SHOWS, INC., Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES, Defendant and Appellant.

854

**COUNSEL**

Lloyd W. Pellman, County Counsel, Lawrence L. Hafetz and Judy W. Whitehurst, Deputy County Counsel, for Defendant and Appellant.

Bill Lockyer, Attorney General, Peter Siggins, Chief Deputy Attorney General, and David De Alba, Assistant Attorney General, for State of California as Amicus Curiae on behalf of Defendant and Appellant.

Moscone, Emblidge & Quadra and G. Scott Emblidge for the City and County of San Francisco, the Cities of Alameda, Berkeley, Inglewood, Los Angeles, Oakland, San Luis Obispo and West Hollywood, the Counties of Alameda, Contra Costa and San Mateo, Legal Community Against Violence, Women Against Gun Violence and Orange County Citizens for the Prevention of Gun Violence as Amici Curiae on behalf of Defendant and Appellant.

Louise H. Renne, City Attorney, Joanne Hoeper, Chief Trial Attorney, Owen J. Clements, Chief of Special Litigation, Ellen M. Forman and D. Cameron Baker, Deputy City Attorneys, for the City and County of San Francisco as Amicus Curiae on behalf of Defendant and Appellant.

Teresa Highsmith, Assistant City Attorney, for the City of Alameda as Amicus Curiae on behalf of Defendant and Appellant.

Law Office of Robert Zweben and Robert Zweben for the City of Albany as Amicus Curiae on behalf of Defendant and Appellant.

Manuela Albuquerque, City Attorney, and Matthew J. Orebic, Deputy City Attorney, for the City of Berkeley as Amicus Curiae on behalf of Defendant and Appellant.

Michael Biddle, City Attorney, for the City of Emeryville as Amicus Curiae on behalf of Defendant and Appellant.

Charles Dickerson, City Attorney, for the City of Inglewood as Amicus Curiae on behalf of Defendant and Appellant.

Charles Williams, City Attorney, for the City of Lafayette as Amicus Curiae on behalf of Defendant and Appellant.

Tom Curry, City Attorney, for the City of Livermore as Amicus Curiae on behalf of Defendant and Appellant.

Daniel S. Murphy, Principal Deputy City Attorney, for the City of Long Beach as Amicus Curiae on behalf of Defendant and Appellant.

James K. Hahn, City Attorney, and Carmel Sella, Assistant City Attorney, for the City of Los Angeles as Amicus Curiae on behalf of Defendant and Appellant.

John A. Russo, City Attorney, Barbara J. Parker, Doryanna M. Moreno and Kandis A. Westmore, Deputy City Attorneys, for the City of Oakland as Amicus Curiae on behalf of Defendant and Appellant.

Lombardi, Loper & Conant and George S. Peyton, Jr., for the City of Piedmont as Amicus Curiae on behalf of Defendant and Appellant.

Daniel J. McHugh, City Attorney, for the City of Redlands as Amicus Curiae on behalf of Defendant and Appellant.

Robert Lazone, City Attorney, for the City of San Carlos as Amicus Curiae on behalf of Defendant and Appellant.

Marsha Jones Mourtrie, City Attorney, for the City of Santa Monica as Amicus Curiae on behalf of Defendant and Appellant.

Michel Jenkins, City Attorney, for the City of West Hollywood as Amicus Curiae on behalf of Defendant and Appellant.

Patrick Faulkner, County Counsel, for the County of Marin as Amicus Curiae on behalf of Defendant and Appellant.

Ann Miller Ravel, County Counsel, and Debra L. Cauble, Assistant County Counsel, for the County of Santa Clara as Amicus Curiae on behalf of Defendant and Appellant.

Steven M. Woodside, County Counsel, for the County of Sonoma as Amicus Curiae on behalf of Defendant and Appellant.

Barrie Becker and Juliet Leftwich for Legal Community Against Violence as Amicus Curiae on behalf of Defendant and Appellant.

Law Offices of Jones & Mayer and Martin J. Mayer for California Police Chiefs Association as Amicus Curiae on behalf of Defendant and Appellant.

David Durant for Youth Alive! as Amicus Curiae on behalf of Defendant and Appellant.

Pasternak, Pasternak & Patton and David J. Pasternak for Los Angeles County Bar Association as Amicus Curiae on behalf of Defendant and Appellant.

Trutanich • Michel, C. D. Michel; Case, Knowlson, Jordan & Wright, Michael F. Wright and Armen Tamzarian for Plaintiff and Respondent.

Benenson & Kates, Don B. Kates; and Steven A. Silver for California Sporting Goods Association and Andrews Sporting Goods as Amici Curiae on behalf of Plaintiff and Respondent.

Mark Barnes & Associates, Mark Barnes; Law Offices of Jeff Caufield and Jeff Caufield for National Association of Arms Shows, Madison Society, Second Amendment Foundation, Bruce Colodny and Jess Guy as Amici Curiae on behalf of Plaintiff and Respondent.

Robert C. Moest for Gun Owners of California as Amicus Curiae on behalf of Plaintiff and Respondent.

Law Offices of Bruce Colodny and Bruce Colodny for California Rifle & Pistol Association and Law Enforcement Alliance of America as Amici Cuirae on behalf of Plaintiff and Respondent.

---

**OPINION**

**MORENO, J.**—We granted the request of the United States Court of Appeals for the Ninth Circuit for certification, pursuant to California Rules of Court, rule 29.5 to address the following questions.

1. Does state law regulating the sale of firearms and gun shows preempt a county ordinance prohibiting gun and ammunition sales on county property?

2. May a county, consistent with article XI, section 7 of the California Constitution, regulate the sale of firearms on its property located in an incorporated city within the borders of the county?

The first question may be rephrased as follows: Does state law *compel* counties to allow their property to be used for gun shows at which guns and ammunition are sold? We conclude that it does not.

We further conclude that a county may regulate the sale of firearms on its property located in a city when, as here, the county ordinance does not conflict with city law.

## I. CERTIFICATION

Rule 29.5(f) of the California Rules of Court states: "The California Supreme Court shall have discretion to accept or deny the request for an answer to [a] certified question of law. In exercising its discretion the court may consider: [¶] (1) factors that it ordinarily considers in deciding whether to grant review of a decision of a California Court of Appeal or to issue an alternative writ or other order in an original matter; [¶] (2) comity, and whether answering the question will facilitate the certifying court's functioning or help terminate existing litigation; [¶] (3) the extent to which an answer

would turn on questions of fact; and [¶] (4) any other factors the court may deem appropriate."

One of the principal grounds for granting review of Court of Appeal decisions is "the settlement of important questions of law." (Cal. Rules of Court, rule 29(a).) This case presents two such important questions that have been hitherto unresolved by this court or the Courts of Appeal: the ability of counties to restrict gun show operations on their property more stringently than does state law, and their ability to do so when the property in question is within the bounds of a city. It appears that the resolution of these questions is critical to the certifying court's resolution of the matter before it. Finally, although there are some qualifying factual circumstances to be considered, the questions presented are for the most part questions of law. Therefore, we concluded certification was appropriate.

## II. STATEMENT OF FACTS

The facts, as stated in the Ninth Circuit's certification order and from our own review of the record, are as follows:

Great Western Shows, Inc. (Great Western) operates three gun and collector shows a year at the Los Angeles County Fairgrounds (Fairgrounds), located in the City of Pomona. It had held shows there for the past 22 years, until the fall of 1999. The exhibitors at the show include sellers of antique (pre-1898) and modern firearms, ammunition, Old West memorabilia, and outdoor clothing.

The County of Los Angeles (County) owns the Fairgrounds, but has contracted with a separate entity, the Los Angeles County Fair Association (the Fair Association), entering into a 56-year lease. Prior to the show scheduled for October 1999, the County passed an ordinance entitled Prohibition on the Sale of Firearms and Ammunition on County Property (hereafter the Ordinance). The Ordinance reads: "The sale of firearms and/or ammunition on county property is prohibited." (Ord., L.A. County Code, ch. 13.67, § 13.67.030.) The Ordinance defines " 'sale' " to include "the act of placing an order." (*Id.*, § 13.67.040, subd. E.) The legislative findings accompanying the Ordinance recited the high incidence of gun-related deaths and injuries in the County and the relatively high frequency of illegal sales at gun shows contributing to such gun violence. (*Id.*, § 13.67.010.) Although the Ordinance applies to all County property, the County passed the law expressly to discourage Great Western's show, and the Fairgrounds is the only property at issue in this case.

To prevent the Ordinance's enforcement from interfering with its October 1999 show, Great Western brought suit against the County in the United

States District Court for the Central District of California. Great Western filed for a preliminary injunction, arguing that the Ordinance infringes commercial speech in violation of the First Amendment to the United States Constitution. Great Western also challenged the Ordinance on the grounds that it is preempted by state gun control laws and that the County, under California law, has no jurisdiction to legislate inside city boundaries. The court granted the preliminary injunction. It found that "Great Western raised a substantial question regarding whether the Ordinance is preempted by state law and whether the County exceeded its lawful authority, and the balance of hardships tips decidedly in favor of Great Western." It did not reach Great Western's First Amendment claim.

The County then filed an interlocutory appeal in the Ninth Circuit, which subsequently certified to us the above questions.

## III. DISCUSSION

### A. Does State Law Preempt the Greater Restriction of Gun and Ammunition Sales on County Property?

#### 1. State Law Preemption in General and as Applied to Gun Control

The general principles governing preemption analysis were summarized in *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893 [16 Cal.Rptr.2d 215, 844 P.2d 534] (*Sherwin-Williams Co.*), as follows:

"Under article XI, section 7 of the California Constitution, '[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.'

■ " 'If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.' [Citations.] [¶] 'A conflict exists if the local legislation " 'duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.' " ' [Citations.] [¶] Local legislation is 'duplicative' of general law when it is coextensive therewith. [Citation.]

"Similarly, local legislation is 'contradictory' to general law when it is inimical thereto. [Citation.]

"Finally, local legislation enters an area that is 'fully occupied' by general law when the Legislature has expressly manifested its intent to 'fully occupy' the area [citation], or when it has impliedly done so in light of one

of the following indicia of intent: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality. [Citations.]" (*Sherwin-Williams Co., supra*, 4 Cal.4th at pp. 897-898, fn. omitted.)

■ A review of the gun law preemption cases indicates that the Legislature has preempted discrete areas of gun regulation rather than the entire field of gun control. The seminal case to advance this proposition is *Galvan v. Superior Court* (1969) 70 Cal.2d 851 [76 Cal.Rptr. 642, 452 P.2d 930] (*Galvan*), in which this court considered a San Francisco gun law that required all firearms within San Francisco, with certain exceptions, to be registered. We observed that Penal Code section 12026, as it was written at the time, provided that " 'no permit or license to purchase, own, possess, or keep any [concealable] firearms at [the owner's] place of residence or place of business shall be required . . . .' " (*Galvan, supra*, 70 Cal.2d at p. 856, fn. 2, italics omitted.) We distinguished between licensing, which signifies permission or authorization, and registration, which entails recording " 'formally and exactly' " (*id.* at p. 856), and therefore declined to find express conflict between the statute and the ordinance. (*Id.* at pp. 856-859.)

Neither did we find preemption by implication according to the three-part test discussed above, which had originally been articulated in *In re Hubbard* (1964) 62 Cal.2d 119 [41 Cal.Rptr. 393, 396 P.2d 809]. (*Sherwin-Williams Co., supra*, 4 Cal.4th at p. 898.) In *Galvan*, we found the San Francisco ordinance did not meet the first test, i.e., that the subject matter had been so fully and completely covered by general law as to clearly indicate that it had become exclusively a matter of state concern. (See *Sherwin-Williams Co., supra*, 4 Cal.4th at p. 898.) "Although [plaintiff] cites a great number of statutes relating to weapons, these statutes do not show that the entire area of gun or weapons control has been so fully and completely covered by general law . . . 'as to clearly indicate that [the subject] has become exclusively a matter of state concern.' [Citation.] There are various subjects that the legislation deals with only partly or not at all . . . . [¶] Further, there are some indications that the Legislature did not believe that it had occupied the entire field of gun or weapons control. Thus, the Legislature has expressly prohibited requiring a license to keep a concealable weapon at a residence or

place of business. (Pen. Code, § 12026.) Such a statutory provision would be unnecessary if the Legislature believed that all gun regulation was improper." (*Galvan, supra*, 70 Cal.2d at p. 860.)

Nor did we find the San Francisco ordinance preempted under the second test, i.e., partial coverage by general law couched in such terms as to indicate clearly that a paramount state concern would not tolerate further or additional local action: "The issue of 'paramount state concern' also involves the question 'whether substantial, geographic, economic, ecological or other distinctions are persuasive of the need for local control, and whether local needs have been adequately recognized and comprehensively dealt with at the state level.' [Citation.] [¶] That problems with firearms are likely to require different treatment in San Francisco County than in Mono County should require no elaborate citation of authority . . . ." (*Galvan, supra*, 70 Cal.2d at pp. 863-864.)

As for the third test of implied preemption, we found "that the San Francisco gun law places no undue burden on transient citizens. . . . The law, applicable to firearms possessed by persons in San Francisco, provides for a seven-day exemption and thus excludes those transients who might otherwise be burdened. [¶] The law . . . interferes less with transients than, for example, the Fresno ordinance prohibiting the consumption of alcoholic beverages on the street [citation], the Los Angeles gambling ordinance [citation], or the Los Angeles loitering ordinance [citation]—all of which were found not preempted by state law, and all of which apply to *anyone* within the geographic confines of the city, and not merely to residents." (*Galvan, supra*, 70 Cal.2d at pp. 864-865, italics & fn. omitted.) We concluded that the San Francisco registration law was not preempted by state law. (*Id.* at p. 866.)

As was recognized in *Olsen v. McGillicuddy* (1971) 15 Cal.App.3d 897 [93 Cal.Rptr. 530] (*Olsen*), the Legislature's response to *Galvan* was to adopt former Government Code section 9619, the predecessor to current Government Code section 53071, which made clear an "intent 'to occupy the whole field of registration or licensing of . . . firearms.' " (*Olsen, supra*, 15 Cal.App.3d at p. 902, italics omitted.) Noting *Galvan*'s strong statement concerning the narrowness of state law firearms preemption, the *Olsen* court found the Legislature's limited response to *Galvan* to be significant: "Despite the opportunity to include an expression of intent to occupy the entire field of firearms, the legislative intent was limited to registration and licensing. We infer from this limitation that the Legislature did not intend to exclude [localities] from enacting further legislation concerning the use of

firearms. [¶] It also does not appear that the adverse effect of a local ordinance on transient citizens of the state outweighs the possible benefit to the [locality]." (*Ibid.,* italics omitted.) The *Olsen* court thus concluded that a Petaluma ordinance that prohibited a parent having care of a minor to permit the minor to possess or fire a BB gun was not preempted by state gun laws.

As pointed out in *California Rifle & Pistol Assn. v. City of West Hollywood* (1998) 66 Cal.App.4th 1302, 1315 [78 Cal.Rptr.2d 591]: "In response to *Olsen,* the Legislature enacted Government Code section 53071.5 . . . which expressly occupies the field of the manufacture, possession, or sale of *imitation* firearms.[1] Thus once again the Legislature's response was measured and limited, extending state preemption into a new area in which legislative interest had been aroused, but at the same time carefully refraining from enacting a blanket preemption of all local firearms regulation." (Italics added.) As the court further explained: "This statute is expressly limited to imitation firearms, thus leaving real firearms still subject to local regulation. The express preemption of local regulation of sales of imitation firearms, but not sales of real firearms, demonstrates that the Legislature has made a distinction, for whatever policy reason, between regulating the sale of real firearms and regulating the sale of imitation firearms." (*California Rifle & Pistol Assn., supra,* 66 Cal.App.4th at p. 1312, italics omitted.) The court accordingly upheld a municipal ordinance banning the sale of so-called Saturday Night Specials. (*Id.* at pp. 1308-1309, 1331-1332; see also *Suter v. City of Lafayette* (1997) 57 Cal.App.4th 1109, 1118-1119 [67 Cal.Rptr.2d 420] [upholding city's ability to confine firearms dealerships to certain commercially zoned areas but striking down provision regarding firearms storage covered by the detailed provisions of Pen. Code, § 12071, subd. (b)(14)].)

On the other hand, a restrictive San Francisco firearm ordinance was held to be preempted in *Doe v. City and County of San Francisco* (1982) 136 Cal.App.3d 509 [186 Cal.Rptr. 380] (*Doe*). The ordinance outlawed the possession of handguns within the city but exempted those persons who obtained a license to carry a concealed weapon under Penal Code section 12050. Reviewing *Galvan* and *Olsen,* the court acknowledged that "these decisions suggested the Legislature has not prevented local government

---

[1]Government Code section 53071.5 states: "By the enforcement of this section, the Legislature occupies the whole field of regulation of the manufacture, sale, or possession of imitation firearms, as defined in Section 417.2 of the Penal Code, and that section shall preempt and be exclusive of all regulations relating to the manufacture, sale, or possession of imitation firearms, including regulations governing the manufacture, sale, or possession of BB guns and air rifles described in subdivision (g) of Section 12001 of the Penal Code."

*bodies from regulating all aspects of the possession of firearms." (Doe,* supra, 136 Cal.App.3d at p. 516.) Nonetheless, the ordinance directly conflicted with Government Code section 53071 and Penal Code section 12026, the former explicitly preempting local licensing requirements, the latter exempting from licensing requirements gun possession in residences and places of business. Thus, the effect of the San Francisco ordinance "is to create a new class of persons who will be required to obtain licenses in order to possess handguns" in residences and places of business (*Doe, supra,* 136 Cal.App.3d at p. 517), which the two statutes forbid (*id.* at pp. 517-518).

In sum, a review of case law and the corresponding development of gun control statutes in response to that law demonstrates that the Legislature has chosen not to broadly preempt local control of firearms but has targeted certain specific areas for preemption. With this framework in mind, we turn to California law regulating gun shows to determine whether and to what extent the Legislature has preempted this area of the law.

### 2. *State Law Preemption of Laws Regulating Gun Shows*

The Legislature has enacted several statutes specifically pertaining to the regulation of gun shows. Penal Code section 12071, which concerns the licensing of retail firearms dealers and mandates a 10-day waiting period for the purchase of firearms, provides that, with certain exceptions, the firearms retail business "shall be conducted only in the buildings designated in the license." (§ 12071, subd. (b)(1)(A).) One of those exceptions, found in subdivision (b)(1)(B), is for gun shows: "A person licensed pursuant to [this section] may take possession of firearms and commence preparation of registers for the sale, delivery, or transfer of firearms at gun shows or events, . . . if the gun show or event is not conducted from any motorized or towed vehicle. A person conducting business pursuant to this subparagraph shall be entitled to conduct business as authorized herein at any gun show or event in the state without regard to the jurisdiction within this state that issued the license pursuant to [this section], provided the person complies with (i) all applicable laws, including, but not limited to, the waiting period specified in subparagraph (A) of paragraph (3), and (ii) *all applicable local laws, regulations, and fees, if any.*" (Italics added.)

Penal Code section 12071.1 also regulates gun shows in a number of ways. It provides that "[n]o person shall produce, promote, sponsor, operate, or otherwise organize a gun show event . . . unless the person possesses a valid certificate of eligibility from the Department of Justice." (*Id.,* subd. (a).) Certification requires the applicant to furnish pertinent information and

liability insurance. Gun show producers are also required to give law enforcement agencies a list of persons and organizations that rent space at the gun shows and provide other information to the Department of Justice and law enforcement agencies. (*Id.*, subds. (f), (g) and (h).) Producers are also required to inform prospective gun show vendors of various statutory requirements (*id.*, subd. (j)) and to post signs at the public entrances informing the public of the basic gun show rules. (*Id.*, subd. (*o*).) Section 12071.1 contains various other such provisions and penalties for violation of regulations.

Penal Code section 12071.4 requires among other things (1) that gun show or event vendors certify that no prohibited weapons will be displayed or sold, that there will be no incitement to hate crimes, that the firearms at the show are unloaded, and that they acknowledge and are responsible for complying with "all applicable federal, state, and *local* laws dealing with the possession and transfer of firearms" (*id.*, subd. (b), italics added); (2) that vendors provide certain information to gun show producers and wear name tags (*id.*, subds. (e) and (f)); and (3) that there be no firearms transfers between private parties unless conducted through a licensed dealer in accordance with applicable state and federal laws (*id.*, subd. (j)).

Applying the preemption analysis set forth above, we first observe that there is no express preemption with regard to the regulation of gun shows. On the contrary, Penal Code section 12071, subdivision (b)(1)(B), expressly contemplates that licensing of firearms dealers at gun shows will be subject to "all applicable local laws, regulations, and fees, if any" and Penal Code, section 12071.4, subdivision (b), refers to gun show vendors' acknowledgement of local laws dealing with the possession and transfer of firearms.

As for implied preemption, we note first of all that the Ordinance is not duplicative of state statutes. Great Western contends that the Ordinance overlaps several statutory provisions, including those prohibiting the sale of machine guns (Pen. Code, § 12220), assault weapons (*id.*, § 12280, subd. (a)(1)) and unsafe handguns (*id.*, § 12125, subd. (a)), and is therefore preempted. We disagree. The Ordinance prohibits and punishes as a misdemeanor "the sale of firearms and/or ammunition on County property." (Ord., L.A. County Code, ch. 13.67, § 13.67.030.) The above statutes prohibit the sale of certain dangerous firearms. Thus, the Ordinance does not criminalize " 'precisely the same acts which are . . . prohibited' " by statute (*Pipoly v. Benson* (1942) 20 Cal.2d 366, 370 [125 P.2d 482, 147 A.L.R. 515]) and is therefore not duplicative. (Cf. *Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 292 [219 Cal.Rptr. 467, 707 P.2d 840] [discrete portions of

ordinance criminalizing exactly the same conduct as statute duplicative of and preempted by state law].) Put another way, possessing a gun on county property is not identical to the crime of selling an illegal assault weapon or handgun, nor is it a lesser included offense, and therefore someone may be lawfully convicted of both offenses. (See *People v. Ortega* (1998) 19 Cal.4th 686, 692 [80 Cal.Rptr.2d 489, 968 P.2d 48].)

Nor is there a direct conflict between the statute and the Ordinance. The Ordinance does not mandate what state law expressly forbids, nor does it forbid what state law expressly mandates. (See, e.g., *Doe, supra,* 136 Cal.App.3d 509 [local law may not impose additional licensing requirements when state law specifically prohibits such requirements]; *Northern Cal. Psychiatric Society v. City of Berkeley* (1986) 178 Cal.App.3d 90 [223 Cal.Rptr. 609] [local ordinance banning electroshock therapy conflicts with state statutes mandating patients be given the choice to have such therapy].) Although the gun show statutes regulate, among other things, the sale of guns at gun shows, and therefore contemplate such sales, the statutes do not mandate such sales, such that a limitation of sales on county property would be in direct conflict with the statutes.

The real question, then, is whether the Legislature intended to occupy the field of gun show regulation. Employing the three-part test discussed above, we answer the first question—whether gun show regulation " 'has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern' " (*Sherwin-Williams Co., supra,* 4 Cal.4th at p. 898)—in the negative. As the above case law demonstrates, the Legislature has declined to preempt the entire field of gun regulation, instead preempting portions of it, such as licensing and registration of guns and sale of imitation firearms. Nor has it preempted the field of gun show regulation, making the conduct of business at such shows subject to "applicable local laws." (Pen. Code, § 12071, subd. (b)(1)(B); see also *id.,* § 12071.4, subd. (b)(2).)

Second, we find that gun show regulation has not " 'been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action.' " (*Sherwin-Williams Co., supra,* 4 Cal.4th at p. 898.) The two subdivisions mentioned above expressly anticipate the existence of "applicable local laws." (Pen. Code, § 12071, subd. (b)(1)(B); *id.,* § 12071.4, subd. (b)(2).) In addition, we are reluctant to find such a paramount state concern, and therefore implied preemption, "when there is a significant local interest to be served that may differ from one locality to another." (*Fisher v. City of Berkeley* (1984) 37

Cal.3d 644, 707 [209 Cal.Rptr. 682, 693 P.2d 261].) It is true today as it was more than 30 years ago when we stated it in *Galvan*, "[t]hat problems with firearms are likely to require different treatment in San Francisco County than in Mono County." (*Galvan, supra*, 70 Cal.2d at p. 864.) "[T]he need for the regulation or prohibition of the carrying of deadly weapons, even though not concealed, may be much greater in large cities, where multitudes of people congregate, than in the country districts or thinly settled communities, where there is much less opportunity and temptation to commit crimes of violence for which such weapons may be used." (*People v. Commons* (1944) 64 Cal.App.2d Supp. 925, 932 [148 P.2d 724].)

Thus, the costs and benefits of making firearms more available through gun shows to the populace of a heavily urban county such as Los Angeles may well be different than in rural counties, where violent gun-related crime may not be as prevalent. The legislative findings of the Ordinance reveal the grave problems that prompted its passage. According to these findings, in 1997 there were 1,385 firearm deaths in Los Angeles County and 2,651 hospitalizations for nonfatal firearm injuries. These figures included 271 young people age 19 or younger killed by firearms and 839 hospitalized for firearm-related injuries. (Ord., L.A. County Code, ch. 13.67, § 13.67.010.) The legislative findings further state that the widespread availability of illegally obtained firearms greatly contributed to the number of shooting incidents across the County, and that a "sting" operation conducted by the state Department of Justice uncovered significant illegal gun trafficking at the Great Western show held at the Fairgrounds. We perceive nothing in state law that impliedly forbids a county from withdrawing its property from use as a venue for gun show sales based on its own calculation of the costs and benefits of permitting such use.

As for the third test, we agree with previous cases that "[l]aws designed to control the sale, use or possession of firearms in a particular community have very little impact on transient citizens, indeed, far less than other laws that have withstood preemption challenges." (*Suter v. City of Lafayette, supra*, 57 Cal.App.4th at p. 1119; *Galvan, supra*, 70 Cal.2d at pp. 864-865.)

But the conclusion that the Legislature has chosen not to preempt the field of gun show regulation does not end the matter. Great Western argues that although the gun show statutes provide for some local regulation of gun shows—for example, subjecting the location of gun shows to County zoning ordinances—the Ordinance at issue in this case goes too far. It cites certain cases interpreting the federal Resource Conservation and Recovery Act (RCRA) (42 U.S.C. §§ 6901-6991) in which local regulation is contemplated by statute but in which a total ban on the activity regulated—that is,

on hazardous waste disposal and recycling—is not permitted. (*Blue Circle Cement, Inc. v. Board of County Com'rs* (10th Cir. 1994) 27 F.3d 1499, 1506-1507; *ENSCO, Inc. v. Dumas* (8th Cir. 1986) 807 F.2d 743, 744-745; *Ogden Environmental Services v. City of San Diego* (S.D.Cal. 1988) 687 F.Supp. 1436, 1446-1447; see also *South Dakota Mining Ass'n, Inc. v. Lawrence County* (8th Cir. 1998) 155 F.3d 1005, 1009-1010.)

In *Blue Circle Cement, Inc. v. Board of County Com'rs, supra,* 27 F.3d at pages 1506-1507, for example, the court considered an ordinance that appeared to grant unlimited discretion to local authorities to deny authorization of industrial waste disposal and treatment facilities within the county that could result in a de facto ban on such facilities. The court noted that the RCRA, 42 United States Code section 6901 et seq., has as one of its main purposes to "enlist[] the states and municipalities to participate in a 'cooperative effort' with the federal government to develop waste management practices that facilitate the recovery of 'valuable materials and energy from solid waste.' 42 U.S.C. § 6902(a)(11)." (27 F.3d at p. 1506.) The court concluded that the RCRA did not permit "an explicit or de facto ban of an activity" encouraged by the statute, but allowed "an ordinance that falls short of imposing a total ban on encouraged activity . . . so long as it is supported by a record establishing that it is a reasonable response to a legitimate local concern for safety or welfare." (*Id.* at p. 1508.)

Thus, *Blue Circle Cement, Inc.,* and related cases cited by Great Western stand broadly for the proposition that when a statute or statutory scheme seeks to promote a certain activity and, at the same time, permits more stringent local regulation of that activity, local regulation cannot be used to completely ban the activity or otherwise frustrate the statute's purpose. These cases are therefore distinguishable from the present one in at least two respects: First, unlike the RCRA, there is no evidence either in the gun show statutes or, as far as we can determine, in their legislative history, that indicates a stated purpose of promoting or encouraging gun shows. Rather the overarching purpose of Penal Code sections 12071, 12071.1, and 12071.4 appears to be nothing more than to acknowledge that such shows take place and to regulate them to promote public safety.

Second, the Ordinance does not propose a complete ban on gun shows within the County, but only disallows gun show sales on County property. Even assuming arguendo that a county is prevented from instituting a general ban on gun shows within its jurisdiction, it is nonetheless empowered to ban such shows on its own property. Government Code section

23004, subdivision (d), gives a county the authority to "[m]anage, sell, lease, or otherwise dispose of its property as the interests of its inhabitants require." (See also Gov. Code, §§ 25900-25908 [giving counties authority over the use of their fairgrounds].) To "manage" property must necessarily include the fundamental decision as to how the property will be used. It is true that the County delegated in part its management of the Fairgrounds to a private corporation via a long-term lease. The terms of the lease limit to some degree the County's management discretion. But it cannot be doubted that the County has the continuing authority, to the extent consistent with its legitimate contractual obligations, to make decisions about how its property will be used pursuant to Government Code section 23004, subdivision (d). It may exercise that discretion through ordinances as well as through contractual agreements. (See *Air Cal, Inc. v. City and County of San Francisco* (9th Cir. 1989) 865 F.2d 1112, 1117; *Santa Monica Airport Ass'n v. City of Santa Monica* (9th Cir. 1981) 659 F.2d 100, 101, 104-105.) None of the gun show statutes reviewed above impliedly seek to override the discretion a county retains in the use of its property.

Great Western argues that this discretion only comes into play when the County acts as a proprietor rather than as a regulator, citing federal preemption cases regarding municipal airport regulation that found the proprietor/ regulator distinction significant. (*Air Cal, Inc. v. City and County of San Francisco, supra,* 865 F.2d 1112; *Pirolo v. City of Clearwater* (11th Cir. 1983) 711 F.2d 1006.) In *Pirolo,* the court considered a suit by an airport lessee against the city that owned a municipal airport challenging a city ordinance that banned night flying into the airport. The court concluded that the Federal Aviation Act (FAA) preempted the city's authority to impose such a curfew. The court suggested, based on case law interpreting a portion of the FAA, that a municipality may have more latitude to set curfews on jet flights if it is acting solely in a proprietary capacity as owner of the airport rather than as regulator. But the court concluded that because the city had contracted away its proprietary power with a lease, it was acting as a regulator rather than a proprietor. (*Pirolo, supra,* 711 F.2d at p. 1010.) Great Western argues that the County in essence relinquished its proprietary function over the Fairgrounds when it entered into a long-term lease with a private corporation and therefore may not impose regulations more stringent than are set forth in state statutes.

While the proprietor/regulator distinction may have special significance in the heavily regulated realm of airport management, we do not find such significance here. Rather, the question is whether the County entirely contracted away its management discretion under Government Code section

23004, subdivision (d), such that when it acted to ban gun show sales on its property it violated its contractual obligations. There is no evidence that it has done so. The ground lease and operating agreement between the County and the Fair Association, at paragraph 5.01, provides simply that the Fair Association will use the property "to operate the Fair and Interim Events" pursuant to various terms and conditions. Paragraph 5.05 forbids the Fair Association from violating "any law, ordinance or regulation applicable to" the Fairgrounds. Furthermore, as Great Western acknowledges, the County renegotiated the lease with the Fair Association, reducing its rental obligations to the County in light of the loss of gun show revenue. Unlike in *Pirolo*, in which the airport lessee complained of the interference of the municipal lessor, the Fair Association is not a party to this case and does not contend the County has violated its contractual obligations by enacting the Ordinance. In short, there is no merit to the argument that the Ordinance was an illegitimate exercise of the County's power to make fundamental management decisions about how its property would be used.

Thus, a county has broad latitude under Government Code section 23004, subdivision (d), to use its property, consistent with its contractual obligations, "as the interests of its inhabitants require." Aside from First Amendment public forum considerations or special statutory requirements not before us, the County is not compelled to grant access to its property to all comers. Nor do the gun show statutes mandate that counties use their property for such shows. If the County does allow such shows, it may impose more stringent restrictions on the sale of firearms than state law prescribes.

For all the above reasons, we conclude that the Ordinance is not preempted by the sale of firearms and/or ammunition on County property. We do not decide whether a broader countywide ban of gun shows would be preempted.

B. *May a County Regulate the Sale of Firearms on Its Property Located Within the Borders of a City?*

In formulating this question, the Ninth Circuit cited several cases that appeared to put the answer in doubt. In *Ex parte Pfirrmann* (1901) 134 Cal. 143 [66 P. 205], the plaintiff, a resident of the City of Los Angeles, challenged the County of Los Angeles's ability to subject him to liquor licensing requirements in addition to the city's requirements. As the court stated, quoting *Ex parte Roach* (1894) 104 Cal. 272, 277 [37 P. 1044]: " 'It is not to be supposed that it was the intention of the people, through their

constitution, to authorize a county to exercise the same power within the territory of the city as the city itself could exercise, or to confer upon the county the right to interfere with or impair the effect of similar legislation by the city itself.' . . . '. . . By the organization of a city within the boundaries of a county, the territory thus organized is *withdrawn* from the legislative control of the county upon the designated subjects, and is placed under the legislative control of its own council; and the principle of local government which pervades the entire instrument is convincive of the intention to withdraw the city from the control of the county, and to deprive the county of any power to annul or supersede the regulations of the city upon the subjects which have been confided to its control.' It is claimed upon the part of respondent, that *Ex parte Roach*, 104 Cal. 277, only goes to the extent of holding that where a conflict arises between the respective regulating ordinances of a county and municipality, that then, in such a case, the ordinance of the municipality within its jurisdiction is controlling. . . . But . . . it has a much broader meaning . . . . If for no other reason, the unfortunate results which would necessarily follow from a judicial holding that the powers of counties and municipalities derived from the constitution as to the enactment of police and sanitary measures within the municipality were *concurrent*, justified the conclusion declared in *Ex parte Roach*, 104 Cal. 277." (*Ex parte Pfirrmann*, *supra*, 134 Cal. at p. 145, italics added.)

Similarly, in *In re Knight* (1921) 55 Cal.App. 511 [203 P. 777], the court struck down a county ordinance enforcing the Volstead Act within the City of Oroville. "[W]hen a municipal corporation is organized within the limits of a county, then so much of the territory of such county as is comprehended within the municipal limits of such corporation is, so far as local government is concerned, withdrawn from the county, and any ordinances passed by the latter can have no binding or any force upon the municipality as to any matters or subjects as to which the latter is vested with the power to enact prohibitory or regulatory local laws." (*Id.* at p. 518, italics omitted.)

*Pfirrmann* and *Knight* establish the principle that cities and counties generally speaking do not exercise concurrent jurisdiction over regulatory matters. But in this case the County is not seeking to exercise concurrent jurisdiction. As discussed above, Government Code section 23004, subdivision (d), authorizes the County to manage its own property, and that includes deciding how the property may be used, whether that decision is embodied in a contract with a private party, in an ordinance, or in some combination of the two. The City of Pomona does not and may not dictate how the County uses its property. (See *Hall v. City of Taft* (1956) 47 Cal.2d 177 [302 P.2d

574] [school district need not obtain city building permits for "sovereign activities" such as the construction and maintenance of its buildings]; *County of Los Angeles v. City of Los Angeles* (1963) 212 Cal.App.2d 160, 167 [28 Cal.Rptr. 32] [applying same principle to counties].) By enacting an ordinance that seeks to regulate the use of its own property, but not the conduct generally of the citizens of Pomona, the County is not exercising regulatory jurisdiction that is coextensive with Pomona.

Nor does County law conflict with Pomona law. No Pomona law mandates that the County use its property for gun shows, nor could it. Absent an actual conflict between city and county law, or an exercise in concurrent jurisdiction, the County's legislation concerning the use of its property cannot be regarded as an unlawful extraterritorial act.

Amicus curiae Gun Owners of California argues that while the County may be able as a property owner to prohibit firearms sales on its property, it does not have the authority to criminalize activity on its property within the City of Pomona. Thus, amicus curiae argues the County may not, as it has done here, establish ordinances on its extraterritorial property, the violation of which constitutes a misdemeanor.

This argument misses the mark. When the County acts pursuant to Government Code section 23004, subdivision (d), it is acting for the "benefit of its inhabitants." Therefore, although it is acting in some sense as a property owner, it is in another sense acting as a governmental entity. It may regulate property by ordinance as well as by contractual arrangement. (See *Air Cal, Inc. v. City and County of San Francisco, supra,* 865 F.2d at p. 1117; *Santa Monica Airport Ass'n v. City of Santa Monica, supra,* 659 F.2d at pp. 104-105.) Given that it may draft ordinances governing the use of its property, even extraterritorial use, and given that the violation of a County ordinance is a misdemeanor (Gov. Code, § 25132, subd. (a)), there is no reason why the Ordinance cannot be enforced on the County's extraterritorial property. (See 74 Ops.Cal.Atty.Gen. 211 (1991) [county may enforce ordinance banning smoking in its buildings, with violations punishable as a misdemeanor, although some of the buildings are within the bounds of a city].)

In sum, the County has authority to enact the Ordinance, notwithstanding the fact that the Ordinance affects County property within the City of Pomona.

IV. CONCLUSION

We therefore conclude that:

1. State law does not preempt a county ordinance prohibiting gun and ammunition sales on county property.

2. A county may regulate the sale of firearms on its property located in an incorporated city within the borders of the county.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**BROWN, J.,** Dissenting.—By enacting an ordinance prohibiting the sale of firearms on county property (L.A. County Code, ch. 13.67, § 13.67.030) and enforcing the ordinance with respect to the Los Angeles County Fairgrounds, Los Angeles County seeks to regulate affairs within the City of Pomona, an incorporated city. It cannot do so. (Cal. Const., art. XI, § 7; *In re Knight* (1921) 55 Cal.App. 511, 517-518 [203 P. 777]; *Ex parte Pfirrmann* (1901) 134 Cal. 143, 145 [66 P. 205].) Citing *Hall v. City of Taft* (1956) 47 Cal.2d 177 [302 P.2d 574], the majority carves out an exception for county regulations governing the use of county property. (Maj. opn., *ante*, at pp. 871-872.) I agree that Los Angeles County is free to manage its property in the City of Pomona without local interference. (*Hall v. City of Taft*, at p. 183.) Pomona may not, for example, dictate the terms of the county's leases. But this exception applies only where a county is acting in its capacity as a property owner. (*Ibid.*) The exception does not permit a county to enact police power regulations governing the use of its property by independent parties to whom it has leased the property, because when the Legislature creates an incorporated city, it delegates that regulatory authority to the city, taking it away from the county. (*In re Knight*, at p. 518; *Ex parte Pfirrmann*, at p. 145.)

In *Hall v. City of Taft*, for example, the school district—a creature of state law—was acting in its capacity as a property owner by constructing a public building on its property. We said that the school district in that circumstance was not subject to local building regulations. (*Hall v. City of Taft, supra*, 47 Cal.2d at pp. 183-189.) We expressly distinguished situations in which the district "enact[s] laws for the conduct of the public at large." (*Id.* at p. 183.) In that case, the regulatory authority would lie with the city, not the school district.

Los Angeles County, as a property owner, is free to prohibit the sale of firearms on its property. The county, however, has leased the Los Angeles County Fairgrounds to an independent party, and therefore, with respect to that property, it has contractually relinquished its property rights, at least in part. Depending on the terms of the lease, the county may have some control over the uses to which its tenant puts the property, or it may be able to

amend its lease to prohibit firearm sales. But the county must act in its capacity *as a property owner*. To the extent the county has contractually relinquished its property rights, it may not use its regulatory authority to retain control, because as soon as the county acts in its *regulatory* capacity, it ceases to fall within the exception we recognized in *Hall v. City of Taft, supra*, 47 Cal.2d 177.

When Los Angeles County enacted an ordinance prohibiting firearm sales on county property, it was not merely acting as a property owner. Rather, it was attempting to regulate the actions of its tenants, and therefore it was "enacting laws for the conduct of the public at large." (*Hall v. City of Taft, supra*, 47 Cal.2d at p. 183.) This it could not do within the City of Pomona.

Accordingly, I dissent.