[No. A115018. First Dist., Div. Four. Jan. 9, 2008.]

PAULA FISCAL et al., Plaintiffs and Respondents, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Appellants.

896

COUNSEL

Dennis J. Herrera, City Attorney, Wayne Snodgrass and Vince Chhabria, Deputy City Attorneys, for Defendants and Appellants.

Trutanich • Michel, C. D. Michel, Don B. Kates, Glenn S. McRoberts and Thomas E. Maciejewski for Plaintiffs and Respondents.

Michael S. Hebel for The San Francisco Police Officers Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

Law Office of Donald Kilmer and Donald E. Kilmer, Jr., for Gun Owners of California, Senator H. L. Richardson, The Madison Society and the California Rifle & Pistol Association as Amici Curiae on behalf of Plaintiffs and Respondents.

Law Offices of Bruce Colodny and Bruce Colodny for American Entertainment Armories Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

OPINION

RUVOLO, P. J.—

## I.

## INTRODUCTION

In 2005, the voters of the City and County of San Francisco (City), a home rule charter city, passed Proposition H, a local ordinance prohibiting (1) virtually all City residents from possessing handguns; and (2) all City residents, without exception, from selling, distributing, transferring and manufacturing firearms and ammunition. A legal challenge to the ordinance resulted in the trial court holding that key aspects of the ordinance were preempted by state law. Based on its further determination that the invalid portions of the ordinance were not severable from the arguably valid portions, the court found that the ordinance was preempted in its entirety. Lastly, the trial court held that the City's home rule power under the California Constitution, article XI, section 5, subdivision (a) (municipal home rule for charter cities) did not override state preemption because the field being regulated was one of statewide, rather than local, concern. We agree with the trial court's conclusions, and affirm the judgment in all respects.

## II.

## FACTS AND PROCEDURAL HISTORY

This appeal concerns Proposition H (Prop. H or ordinance), a municipal ordinance enacted by the City's voters in November 2005. The "Findings" section of Prop H states that "[h]andgun violence is a serious problem in San Francisco . . . ," accounting for 67 percent of injuries or deaths caused by firearms in the City in 1999. These findings also state that Prop. H is not intended to affect residents from other jurisdictions with regard to handgun possession. Therefore, "the provisions of Section 3 [banning handgun possession in the City] apply exclusively to residents of the City and County of San Francisco." Section 1 also invokes the City's "home rule" power and describes that power as allowing "counties to enact laws that exclusively apply to residents within their borders, even when such a law conflicts with state law or when state law is silent."

Prop. H contains two substantive provisions, section 2 and section 3. Section 2 is entitled "Ban on Sale, Manufacture, Transfer or Distribution of Firearms in the City and County of San Francisco." It states, in its entirety, that "[w]ithin the limits of the City and County of San Francisco, the sale, distribution, transfer and manufacture of all firearms and ammunition shall be prohibited." There are no exceptions to this section.

Section 3 is entitled "Limiting Handgun Possession in the City and County of San Francisco." It states that within City boundaries, "no resident of the City and County of San Francisco shall possess any handgun unless required for professional purposes, as enumerated herein." Section 3 contains narrow exemptions to the City's ban on possession of handguns for government employees carrying out the functions of government employment, active members of the United States Armed Forces or the National Guard, and security guards "while actually employed and engaged in protecting and preserving property or life within the scope of his or her employment . . . ." Section 3 indicates that any City resident may surrender his or her handgun "without penalty" at any district station of the San Francisco Police Department or to the San Francisco Sheriff's Department within 90 days after section 3 becomes effective. The City's board of supervisors is charged with enacting penalties for violation of the ordinance.

Section 6 is entitled "State Law." It provides that "[n]othing in this ordinance is designed to duplicate or conflict with California state law . . ." or to "create or require any local license or registration for any firearm, or create an additional class of citizens who must seek licensing or registration." Additionally, the ordinance does not apply to "any person currently denied the privilege of possessing a handgun under state law . . . ."

Finally, section 7 of the ordinance contains a severability clause that provides "[i]f any provision of this ordinance or the application thereof to any person or circumstances is held invalid or unconstitutional, such invalidity or unconstitutionality shall not affect other provisions or applications or [sic] this ordinance[,] which can be given effect without the invalid or unconstitutional provision or application. To this end, the provisions of this ordinance shall be deemed severable."

After Prop. H passed, Paula Fiscal, several retired law enforcement and military personnel, two law enforcement associations, and several firearms rights groups (collectively, petitioners) sought a writ of mandate declaring Prop. H invalid. Among other arguments, petitioners challenged the ordinance on the grounds that it was preempted by state law.

The trial court granted petitioners' request for writ of mandate, finding Prop. H unenforceable, primarily because it was preempted by three separate state laws regulating firearms. Specifically, the court determined that the key provisions of Prop. H, prohibiting the sale of firearms and possession of handguns by City residents, were preempted by Penal Code section 12026, subdivision (b) (prohibiting localities from restricting handgun possession in an individual's home, business, or private property), Government Code section 53071 (indicating an express intent by the Legislature to occupy the whole field of firearms licensing and registration) and the Unsafe Handgun Act (UHA), Penal Code sections 12125 to 12233 (establishing a protocol for designating which handguns may be sold in California). Finally, the trial court found that any residual portions of Prop. H arguably valid were not severable because the court could not disentangle the various bans without exceeding its powers by deleting and adding words, i.e., rewriting the ordinance. The court further concluded that the subject of Prop. H "dealing with the possession and use of handguns" is one of statewide concern and therefore controlled by the applicable state law. This appeal followed.

## III.

## DISCUSSION

### A. Introduction

Before addressing the issues raised in this case, we briefly note what is not at issue in this appeal. This case is not about the public policy choices that the voters in San Francisco have made by enacting Prop. H. Thus, we need not, and do not, pass judgment on the merits of Prop. H, or engage ourselves in the sociological and cultural debate about whether gun control is an effective means to combat crime. (Compare Ayres & Donohue, *Shooting*

*Down the "More Guns, Less Crime" Hypothesis* (2003) 55 Stan. L.Rev. 1193 with Comment, *Confirming "More Guns, Less Crime"* (2003) 55 Stan. L.Rev. 1313.) Similarly, the question of whether California citizens do or do not enjoy a constitutional right to own or possess firearms, or if it exists, whether that right can be limited by local gun control legislation has not been raised or argued by the parties to this case. (See generally *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 481 [97 Cal.Rptr.2d 334, 2 P.3d 581] [no mention made in California Constitution of right to bear arms].) Our task is simply to determine whether Prop. H is preempted by state law.

### B.  California Preemption Analysis and Standard of Review

■ In *O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061 [63 Cal.Rptr.3d 67, 162 P.3d 583] (*O'Connell*), our Supreme Court recently restated the guiding principles for determining whether a local ordinance is displaced by a state measure. The court explained, " 'Under article XI, section 7 of the California Constitution, "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general [state] laws." [¶] "If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void." [Citations.] [¶] "A conflict exists if the local legislation ' "*duplicates, contradicts,* or *enters an area fully occupied* by general law, either expressly or by legislative implication." ' " [Citations.]' (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897 [16 Cal.Rptr.2d 215, 844 P.2d 534], italics added, fn. omitted (*Sherwin-Williams*); see also *American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1251 [23 Cal.Rptr.3d 453, 104 P.3d 813] (*American Financial*).)" (*O'Connell, supra,* 41 Cal.4th at p. 1067.)

The *O'Connell* court explained the italicized terms as follows: "A local ordinance *duplicates* state law when it is 'coextensive' with state law. (*Sherwin-Williams, supra,* 4 Cal.4th at pp. 897–898, citing *In re Portnoy* (1942) 21 Cal.2d 237, 240 [131 P.2d 1] [as 'finding "duplication" where local legislation purported to impose the same criminal prohibition that general law imposed'].)

"A local ordinance *contradicts* state law when it is inimical to or cannot be reconciled with state law. (*Sherwin-Williams, supra,* 4 Cal.4th at p. 898, citing *Ex parte Daniels* (1920) 183 Cal. 636, 641–648 [192 P. 442] [as finding ' "contradiction" ' in a local ordinance that set the maximum speed limit for vehicles below that set by state law].)

"A local ordinance *enters a field fully occupied* by state law in either of two situations—when the Legislature 'expressly manifest[s]' its intent to

occupy the legal area or when the Legislature 'impliedly' occupies the field. (*Sherwin-Williams, supra,* 4 Cal.4th at p. 898; see also 8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 986, p. 551 ['[W]here the Legislature has manifested an intention, expressly or by implication, wholly to occupy the field . . . municipal power [to regulate in that area] is lost.'].)" (*O'Connell, supra,* 41 Cal.4th at pp. 1067–1068.)

The *O'Connell* court went on to say: "When the Legislature has not expressly stated its intent to occupy an area of law, we look to whether it has *impliedly* done so. This occurs in three situations: when ' "(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the" locality.' (*Sherwin-Williams, supra,* 4 Cal.4th at p. 898.)" (*O'Connell, supra,* 41 Cal.4th at p. 1068.)

█ Because the City in this case is a charter city, the home rule doctrine also comes into play. Article XI, section 5, subdivision (a) of the California Constitution reserves to charter cities the right to adopt and enforce ordinances that conflict with general state laws, provided the subject of the regulation is a "municipal affair" rather than one of "statewide concern." (*Johnson v. Bradley* (1992) 4 Cal.4th 389, 398–399 [14 Cal.Rptr.2d 470, 841 P.2d 990].) " 'Because the various sections of article XI fail to define municipal affairs, it becomes necessary for the courts to decide, under the facts of each case, whether the subject matter under discussion is of municipal or statewide concern. This question must be determined from the legislative purpose in each individual instance.' . . ." (*City of Santa Clara v. Von Raesfeld* (1970) 3 Cal.3d 239, 246 [90 Cal.Rptr. 8, 474 P.2d 976], quoting *Professional Fire Fighters, Inc. v. City of Los Angeles* (1963) 60 Cal.2d 276, 294 [32 Cal.Rptr. 830, 384 P.2d 158].)

A trial court's decision invalidating a local ordinance on grounds of preemption is reviewed de novo. (See *City of Watsonville v. State Dept. of Health Services* (2005) 133 Cal.App.4th 875, 882 [35 Cal.Rptr.3d 216]; *Pieri v. City and County of San Francisco* (2006) 137 Cal.App.4th 886, 889 [40 Cal.Rptr.3d 629].) Similarly, where a charter city ordinance is challenged on preemption grounds and is defended as a permissible exercise of the city's home rule power, the challenge also presents a question of law which must be decided on a case-by-case basis. (*Northern Cal. Psychiatric Society v. City of Berkeley* (1986) 178 Cal.App.3d 90, 100 [223 Cal.Rptr. 609] (*Northern Cal. Psychiatric Society*).)

## C. Overview of Parties' Arguments

The preemption doctrine outlined above frames the parties' arguments. Petitioners contend the ordinance contains multiple provisions that trespass into fields of regulation that the state has either expressly or impliedly fully occupied. According to petitioners, state law has so thoroughly and pervasively covered the subjects covered by Prop. H, and the subjects are so in need of uniform state treatment, that the City's most recent effort to restrict its citizens' ability to purchase, own, and possess firearms, at home and at their businesses, is clearly preempted.

In rebuttal, the City points out that the Legislature has never made clear its intention to preempt local regulation of firearms, and therefore this court should not infer preemption. The City stresses San Francisco is besieged by violent crime, which often involves firearms, and the state Legislature has failed to enact laws that would effectively address the gun violence that "has particularly ravaged the City's less affluent neighborhoods and minority communities." In light of the Legislature's inaction, the City claims it is essential that it be able to enact its own local ordinance restricting access to firearms in order to provide for the safety and welfare of its citizens.

The City is correct to the extent it argues that the Legislature has never expressed an intent to preempt the entire field of firearm regulation to the exclusion of local control. The Legislature, instead, has chosen to preempt "discrete areas of gun regulation." (*Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853, 861 [118 Cal.Rptr.2d 746, 44 P.3d 120] (*Great Western*).) "That state law tends to concentrate on specific areas, leaving unregulated other substantial areas relating to the control of firearms, indicates an intent to permit local governments to tailor firearms legislation to the particular needs of their communities. [Citation.]" (*Suter v. City of Lafayette* (1997) 57 Cal.App.4th 1109, 1119 [67 Cal.Rptr.2d 420] (*Suter*).)

We therefore turn to the state statutory scheme to determine whether any of the provisions of Prop. H duplicate or contradict state law, or whether its subject matter invades a field that the state has fully occupied, either expressly or implicitly. (*O'Connell, supra*, 41 Cal.4th at pp. 1067–1068.) In undertaking a preemption analysis, we examine the myriad of subjects covered by the ordinance section by section, starting with section 3's handgun ban. Despite the fact that no other court has been called upon to consider a local firearms ban of this scope,[1] this court, when considering the power of the City to legislate in this area, is by no means writing on a blank slate.

---

[1] In a recent law review article, counsel for petitioners have characterized Prop. H as "the most extreme gun ban ever enacted in the United States, except for the confiscation of all

### D. Section 3 of Prop. H Entitled "Limiting Handgun Possession in the City and County of San Francisco" Is Preempted by State Law

With narrow exceptions, section 3 of Prop. H bans the *possession* of handguns by San Francisco residents, including handgun possession within the sanctity of homes, businesses, and private property.[2] The trial court identified two state statutes, "each of which specifically preempts a narrowly limited field of firearms regulation," which the trial court found preempted section 3. (*California Rifle & Pistol Assn. v. City of West Hollywood* (1998) 66 Cal.App.4th 1302, 1318 [78 Cal.Rptr.2d 591] (*CRPA*).) These two code sections are Penal Code section 12026, subdivision (b) [prohibiting localities from restricting handgun possession in an individual's home, business, or private property] and Government Code section 53071 [indicating an express intent by the Legislature to occupy the whole field of firearms licensing and registration]. The trial court's conclusion is supported by the legislative history and subsequent judicial interpretation of these provisions.

In its current form, Penal Code section 12026, subdivision (b), reads that if a California resident suffers no legal impediment to handgun ownership, "[n]o permit or license" shall be required "to purchase, own, possess, keep, or carry, either openly or concealed, a pistol, revolver, or other firearm capable of being concealed upon the person within the citizen's or legal resident's place of residence, place of business, or on private property owned or lawfully possessed by the citizen or legal resident."[3] Penal Code section 12026 was enacted in 1923 as part of the Uniform Firearms Act. By barring the imposition of any permit or licensing requirement, Penal Code section 12026 served to preclude local public entities from adopting impediments on legally qualified citizens wishing to "purchase, own, possess, keep, or carry" a concealable firearm in their homes or businesses.

---

firearms enacted by the seceding state of Tennessee during the Civil War." (Kates & Michel, *Local Gun Bans in California: A Futile Exercise* (2007) 41 U.S.F. L.Rev. 333, 334, fn. omitted.)

[2] Section 3 prohibits possession of only handguns, so presumably other types of firearms, such as rifles or shotguns, are outside its scope.

[3] Currently, Penal Code section 12026, subdivision (b) reads in full: "No permit or license to purchase, own, possess, keep, or carry, either openly or concealed, shall be required of any citizen of the United States or legal resident over the age of 18 years who resides or is temporarily within this state, and who is not within the excepted classes prescribed by Section 12021 or 12021.1 of this code [relating to certain persons convicted of crimes and to narcotics addicts] or Section 8100 or 8103 of the Welfare and Institutions Code [relating to persons with mental disorders], to purchase, own, possess, keep, or carry, either openly or concealed, a pistol, revolver, or other firearm capable of being concealed upon the person within the citizen's or legal resident's place of residence, place of business, or on private property owned or lawfully possessed by the citizen or legal resident." Hereafter, we will simply refer to this section as Penal Code section 12026.

In *Galvan v. Superior Court* (1969) 70 Cal.2d 851, 855 [76 Cal.Rptr. 642, 452 P.2d 930] (*Galvan*) our Supreme Court held that Penal Code section 12026 did not prohibit San Francisco from passing an ordinance requiring the registration of most firearms within city limits. (70 Cal.2d at pp. 855, 859.) The Supreme Court held that the San Francisco ordinance did not contradict section 12026 because "registration" has an entirely different meaning than "licensing," and registration and licensing, by their very nature, seek to achieve different goals. (70 Cal.2d at pp. 856–858.) Significantly, in discussing Penal Code section 12026, *Galvan* interpreted the "no permit or license . . . shall be required" language broadly, as indicating a legislative intent "that the right to possess a weapon at certain places could not be circumscribed by imposing any requirements . . . ." (70 Cal.2d at p. 858.)

■ In response to *Galvan,* the Legislature enacted Government Code former section 9619 (Stats. 1969, ch. 1428, § 1, p. 2933), later recodified at Government Code section 53071 (Stats. 1971, ch. 438, § 95, p. 884) (Government Code section 53071). This section expressly preempts all local laws which attempt to regulate either licensing or registration of firearms, by declaring "the intention of the Legislature to occupy the whole field of regulation of the registration or licensing of commercially manufactured firearms" while expressly prohibiting "all local regulations, relating to registration or licensing of commercially manufactured firearms . . . ." (Gov. Code, § 53071.)[4]

After Government Code section 53071 was enacted, San Francisco passed an ordinance requiring anyone seeking to purchase a concealable firearm within the City first to get a permit from the City's police chief. This permit requirement was easily struck down by the court in *Sippel v. Nelder* (1972) 24 Cal.App.3d 173 [101 Cal.Rptr. 89] as running afoul of both Penal Code section 12026 and Government Code section 53071. (24 Cal.App.3d at p. 177.) The court concluded that, with the passage of Government Code section 53071, "the Legislature resolved any possible doubt as to its intent to fully occupy the field of firearm control, both in terms of registration and licensing." (24 Cal.App.3d at p. 177.) The court also held that the plaintiff was "entitled, under Penal Code . . . section 12026, to possess a concealed firearm at his residence without obtaining a license or permit of any kind." (*Id.* at p. 177.)

---

[4] Government Code section 53071 reads in full: "It is the intention of the Legislature to occupy the whole field of regulation of the registration or licensing of commercially manufactured firearms as encompassed by the provisions of the Penal Code, and such provisions shall be exclusive of all local regulations, relating to registration or licensing of commercially manufactured firearms, by any political subdivision as defined in Section 1721 of the Labor Code."

Ten years later, in *Doe v. City and County of San Francisco* (1982) 136 Cal.App.3d 509 [186 Cal.Rptr. 380] (*Doe*), Division Three of this court was called upon to examine a San Francisco ordinance banning the possession of handguns within City limits. Exempted from the ordinance were persons possessing a state license to carry a concealed firearm under Penal Code section 12050. (136 Cal.App.4th at p. 512.)

■ The *Doe* court found the ordinance preempted by employing multiple, alternative analyses. Most important to our analysis of Prop. H, the court concluded that Penal Code section 12026 was intended to occupy the field of residential firearm possession. (*Doe, supra,* 136 Cal.App.3d at p. 518.) "It is at least arguable that the state Legislature's adoption of numerous gun regulations has not impliedly preempted *all areas* of gun regulation. . . . However, we infer from Penal Code section 12026 that the Legislature intended to occupy the field of residential handgun possession to the exclusion of local governmental entities. A restriction on requiring permits and licenses necessarily implies that possession is lawful without a permit or license. It strains reason to suggest that the state Legislature would prohibit licenses and permits but allow a ban on possession." (*Id.* at p. 518, citation omitted.)

In our view, *Doe* correctly interpreted Penal Code section 12026 as depriving local entities of any power to regulate handgun possession on private property. The City claims *Doe*'s "finding of a legislative intent to occupy the field of residential handgun possession" was based on "faulty reasoning." It argues that *Doe* interpreted Penal Code section 12026 too broadly because when read literally, section 12026 does nothing more than preempt local governments from imposing a requirement "that gun owners obtain a permit [or license] to purchase a handgun or to keep a handgun in their home or business . . . ." However, the city cites to no subsequent case which has overruled, disapproved of, or even sought to limit or clarify, the *Doe* decision. In fact, *Doe* has been cited with approval by our Supreme Court. (*Great Western, supra,* 27 Cal.4th at p. 864.)

■ Also, " 'the Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have enacted and amended statutes in the light of such decisions as have a direct bearing upon them.' [Citation.]" (*Barajas v. City of Anaheim* (1993) 15 Cal.App.4th 1808, 1814–1815 [19 Cal.Rptr.2d 764].) Given the presumption of the Legislature's awareness of *Doe* during the three times it has reenacted Penal Code section 12026 since the *Doe* decision,[5] it is reasonable to assume that if the Legislature intended to reopen this area of regulation to local units

---

[5] Statutes 1995, chapter 322, section 1, page 1803; Statutes 1989, chapter 958, section 1, page 3372; Statutes 1988, chapter 577, section 2, pages 2128–2129. The one noteworthy change is

of government, it would have addressed the issue specifically by repealing or amending Penal Code section 12026. (*Olmstead v. Arthur J. Gallagher & Co.* (2004) 32 Cal.4th 804, 815 [11 Cal.Rptr.3d 298, 86 P.3d 354].) Because it did not do so, we conclude that the Legislature intended to maintain the prohibitions placed on local government that are contained in Penal Code section 12026, as interpreted by the *Doe* decision. (*Peltier v. McCloud River R.R. Co.* (1995) 34 Cal.App.4th 1809, 1821 [41 Cal.Rptr.2d 182] [refusing to consider arguments that a previous case's interpretation of a statute was wrong, given that the statute was reenacted without change to the language interpreted].)[6]

■ Therefore, insofar as section 3 of the ordinance operates to prohibit and punish handgun possession by City residents on private property, e.g., in their homes and businesses, it is impliedly preempted by Penal Code section 12026. We agree with *Doe* that it can be readily "infer[red] from Penal Code section 12026 that the Legislature intended to occupy the field of residential handgun possession to the exclusion of local governmental entities." (*Doe, supra,* 136 Cal.App.3d at p. 518.)

While we have thus far focused on the relationship between state law and section 3's ban on handgun possession on one's private property, it is important to note that section 3 regulates in a much broader field than just private property. Section 3 prohibits both *public and private* handgun possession and thus effectively displaces numerous state laws allowing private citizens to possess handguns for self-protection and other lawful purposes. As the trial court noted, "[t]he statute books contain almost one hundred pages of unannotated state gun laws that set out a myriad of statewide licensing schemes, exceptions, and exemptions dealing with the possession and use of handguns." We provide a brief overview of just a few of the state statutes dealing with public handgun possession.

Penal Code section 12050 provides that, upon a showing of good cause, any law-abiding, responsible adult can obtain a license to carry a concealed handgun. Even without a license, Penal Code sections 12025.5 and 12031, subdivision (j)(2) create special exceptions whereby people who have been threatened and who have obtained restraining orders may carry loaded and concealed handguns. Penal Code sections 12027, subdivision (a) and 12031, subdivision (b)(1) allow civilians to possess concealed and loaded handguns

---

that Penal Code section 12026 is now subdivided. See Statutes 1988, chapter 577, section 2, pages 2128–2129; Statutes 1989, chapter 958, section 1, page 3372; Statutes 1995, chapter 322, section 1, page 1803.

[6] One can easily infer from how expeditiously the Legislature moved to enact what is now Government Code section 53071 after the *Galvan* case was decided that our lawmakers have an acute awareness of, and an abiding interest in, firearms regulation.

when summoned by police to assist police in making an arrest or to preserve the peace. Penal Code section 12031, subdivision (k) permits possession of a loaded gun when making a citizen's arrest. Penal Code section 12031, subdivision (j)(1) allows possession of a loaded firearm when a person has a reasonable belief that he or she is in immediate grave danger and the firearm is necessary to protect person or property.

Certain classes of persons, while engaged in legitimate activities, are exempted from the operation of most of the statutory prohibitions governing handgun possession, including law enforcement agencies and officers (see, e.g., Pen. Code, §§ 12027, subd. (a)(1)(A), 12201, subds. (a), (b), 12287, subds. (a)(4), (5), 12302, 12031, subd. (b), including retired peace officers [Pen. Code, § 12027, subd. (a)(1)(A)], and the military [Pen. Code, § 12280, subds. (e), (f)(1)]).

Additionally, special exemptions and licenses are granted to certain individuals in the private sector, including the private security industry (Pen. Code, § 12031, subds. (b)(7), (d)(1)–(6)), entertainment industry professionals (Pen. Code, §§ 12072, subd. (a)(9)(B)(vi), 12026.2, subd. (a)(1), (8), 12305, subd. (a)), members of gun clubs (Pen. Code, §§ 12027, subd. (f), 12026.2, subd. (a)(2)), and private investigators (Pen. Code, § 12031, subd. (d)(3)). Any legal firearm may be possessed in public for hunting or shooting at a target range, or going to or from these places, one's home and business, and certain other recognized activities (Pen. Code, § 12026.2, subd. (a)(3), (9).)

■ The broad language of Government Code section 53071, prohibiting "all local regulations, *relating* to registration or licensing" of firearms, indicates that the state has an interest in statewide uniformity of handgun licensing. (Italics added.) In finding Government Code section 53071 expressly preempted Prop. H, the trial court pointed out that the ordinance had the practical effect of "revoking or otherwise invalidating existing state licenses," including those permitting the possession of handguns. The trial court went on to conclude that "[a] local regulation that invalidates existing licenses, but does not affirmatively create new licensing schemes, 'relates' to the state's regulatory scheme of licensing firearms" and, consequently, is expressly preempted by Government Code section 53071. We agree.

While the City emphatically argues that Prop. H is a proper response to crime because it is aimed at criminals who use handguns in the commission of their unlawful acts, the City's arguments fail to acknowledge that the ordinance will affect more than just criminals. It will also affect every City resident who has not, through some demonstration of personal disability or irresponsibility, lost his or her right to possess a handgun. Although a precise assessment of the impact of this ordinance is difficult to gauge because the

ordinance has never been enforced, at a minimum, section 3 of Prop. H would invalidate all licenses possessed by City residents to carry a concealed weapon issued under Penal Code section 12050, and it would prohibit the possession of handguns by City residents even if those residents are expressly authorized by state law to possess handguns for self-defense or other lawful purposes.

■ If the preemption doctrine means anything, it means that a local entity may not pass an ordinance, the effect of which is to completely frustrate a broad, evolutional statutory regime enacted by the Legislature. ■ Section 3 of Prop. H stands as an obstruction to the accomplishment and execution of the full purposes and objectives of the legislative scheme regulating handgun possession in this state. For that further reason, it is preempted. (*Sherwin-Williams Co. v. City of Los Angeles, supra*, 4 Cal.4th at pp. 897–898 [local legislation is preempted if it is "inimical" to accomplishment of the state law's policies].)

### E. Section 2 of Prop. H Entitled "Ban on Sale, Manufacture, Transfer or Distribution of Firearms in the City and County of San Francisco" Is Preempted by State Law

Section 2 of the ordinance provides in full: "Within the limits of the City and County of San Francisco, the sale, distribution, transfer and manufacture of all firearms and ammunition shall be prohibited." Unlike section 3, there are no exceptions contained in section 2. Presumably, if section 2 were enforced, there would be no sales of firearms or ammunition in the City. Storefront firearms dealers in the City would immediately go out of business. Other businesses that deal in the sale of firearms, such as auction houses that offer collectible firearms for sale, would also be adversely affected. The impact of the "transfer" and "distribution" bans are more difficult to gauge. A literal interpretation of the transfer/distribution ban could lead to absurd results, such as prohibiting law enforcement agencies from distributing firearms and ammunition to their officers.

■ We first note that the key provision of section 2, banning the sale of all firearms within City limits, runs into many of the same preemption obstacles as does section 3. First, it is at odds with Penal Code section 12026's guarantee that City residents be able "to *purchase,* own, possess, keep, or carry" firearms at their homes, and businesses. (Italics added.) As the trial court recognized, "[a] local ordinance that substantially burdens the purchasing and possession of handguns by banning their sale is just as contrary to section 12026 as was the possession ban struck down by *Doe.*"

■ Second, we agree with the trial court that section 2 contravenes Government Code section 53071, which expressly preempts any local enactments "relating to" the licensing or registration of commercially manufactured firearms. As noted by the trial court, "San Francisco currently has gunshops, pawnshops, and auction houses that hold valid state licenses specific to their firearm transactions. . . . Section 2 effectively cancels all of these licenses." (See Pen. Code, §§ 12070, subd. (a), 12071, 12072, 12078.) Clearly, therefore, in adopting section 2, San Francisco has entered the preempted field of firearms registration and licensing in express derogation of Government Code section 53071.

■ Lastly, we agree with the trial court that section 2's citywide ban on the sale of firearms is impliedly preempted due to its duplication of, and contradiction with, the UHA (Pen. Code, §§ 12125–12233). The UHA was enacted in 1999 in response to the proliferation of local ordinances banning low cost, cheaply made handguns known as "Saturday Night Specials," which called to the Legislature's attention the need to address the issue of handgun sales in a more comprehensive manner. (See Stricker, *Gun Control 2000: Reducing the Firepower* (2000) 31 McGeorge L.Rev. 293, 313 (*Gun Control 2000*).)

The UHA uniformly bans the sale of Saturday Night Specials in California, but it also includes provisions applicable to *all* handguns sold in the state, including those of higher quality. (Pen. Code, § 12125, subd (a).) For example, the UHA requires that all models of handguns meet certain quality assurance tests and other standards before being approved for sale in this state, including specified standards relating to the safe firing of the handgun and the ability to drop the handgun without it firing accidentally. (Pen. Code, §§ 12126, 12127, subd. (a).) The UHA charges the California Department of Justice with testing and compiling a list of handguns that "may be sold in this state pursuant to this title." (Pen. Code, § 12131, subd. (a).) There are criminal penalties for violating the UHA (for instance, selling a Saturday Night Special) with potential imprisonment for up to one year in a county jail. (Pen. Code, § 12125, subd. (a).)

The trial court held that section 2's wholesale ban on the sale of firearms within City limits, including all handguns, was impliedly preempted by the UHA. In reaching its conclusion, the trial court pointed out that, with respect to unsafe UHA-prohibited handguns, section 2 "duplicates state law by doubly banning them." For UHA-approved handguns, section 2 conflicts with

state law because it has the effect of banning the sale of every single handgun which the UHA indicates "may be sold" in California. (Pen. Code, § 12131, subd. (a).)[7]

In challenging this conclusion, the City first claims the UHA has no applicability to resolving the preemption question posed in this case because this legislation was simply a consumer measure unrelated to the regulation of firearms as a response to crime. (See *Santa Monica Pines, Ltd. v. Rent Control Board* (1984) 35 Cal.3d 858, 868–869 [201 Cal.Rptr. 593, 679 P.2d 27], disapproved on other grounds in *City of West Hollywood v. Beverly Towers, Inc.* (1991) 52 Cal.3d 1184, 1191–1192 [278 Cal.Rptr. 375, 805 P.2d 329] [where local legislation serves local purposes, and state legislation that appears to be in conflict actually serves different, statewide purposes, preemption will not be found].) While the UHA was primarily enacted to "protect legitimate owners and innocent bystanders from a product that may inadvertently injure them," the UHA also has the effect of "eliminating a type of firearm from criminals' arsenals." (*Gun Control 2000, supra,* 31 McGeorge L.Rev. at p. 316, fns. omitted.)

Petitioners offer legislative history of the UHA, of which we take judicial notice, showing that one of the goals of the UHA included curbing handgun crime, as well as promoting gun safety.[8] We have also taken judicial notice of Assembly Bill No. 1471 (2007–2008 Reg. Sess.), entitled "the Crime Gun Identification Act of 2007," which was signed into law by Governor Arnold Schwarzenegger on October 13, 2007, and became effective January 1, 2008. (See Stats. 2007, ch. 572, § 2, enacting Pen. Code, § 12126.) Assembly Bill No. 1471 amends the UHA by requiring that all semiautomatic handguns sold in California after January 1, 2010, be equipped with an array of characters identifying the make, model, and serial number of the handgun. These characters must be embossed onto the pistol's firing pin and interior surfaces,

---

[7] The theory of implied preemption relied upon by the trial court has been explained as follows: "A local government cannot adopt a regulation which duplicates state law, because to do so would create a conflict of jurisdiction between the locality and the state in cases of violation. . . . Nor can a local government adopt a regulation which contradicts, or 'is inimical to,' state law. . . . In either of these circumstances, the invalidity of local law arises not from any specific intention of the state legislature that local governments be barred from regulating, but from the effect that the local action would have on the state's ability to exercise its sovereignty." (Gorovitz, *California Dreamin': The Myth of State Preemption of Local Firearm Regulation* (1996) 30 U.S.F. L.Rev. 395, 401, italics & fns. omitted (*California Dreamin'*).)

[8] This legislative history shows that: (1) banning cheaply made guns has been advocated as a means of reducing gun availability to criminals; (2) the first two times the Legislature enacted the UHA it was vetoed by then Governor Pete Wilson because it would deprive the poor of needed protection by outlawing the purchase of the only firearm they could afford; and (3) cities and groups supporting the passage of the UHA wrote the Legislature that the UHA would ban certain guns used by criminals, and thereby reduce gun crime.

which will then be imprinted on each cartridge case when the handgun is fired. This new technology, identified as microstamping, will provide important investigative leads in solving gun-related crimes by allowing law enforcement personnel to quickly identify information about the handgun from spent cartridge casings found at the crime scene. There can be no doubt that this newly enacted amendment to the UHA deals with crime prevention and criminal apprehension. We therefore reject the City's argument that the UHA can have no preemptive effect because it is a consumer protection statute that operates in a different regulatory field than does section 2.

The legislative history of the UHA also reveals that the issue of preemption was specifically raised with respect to the existing local bans on the sale of Saturday Night Specials as well as any future attempts by local governments to ban handgun sales more broadly. A report by the Senate Committee on Public Safety concluded that "[t]his bill would appear to preempt any such local ordinance, both those already in existence and any proposed locally in the future." (Sen. Com. on Public Safety, Rep. on Sen. Bill No. 15 (1999–2000 Reg. Sess.) as amended Apr. 5, 1999, p. 13.) In apparent response to this concern, a subsequent amended version of the April 5, 1999 version of the proposed bill addressed the question of preemption directly by including language expressly preserving the power of local governments to place a "more stringent requirement upon the manufacture, importation, transfer, sale, or possession of handguns." (Assem. Amend. to Sen. Bill No. 15 (1999–2000 Reg. Sess.) June 2, 1999, p. 11, italics omitted.) Had the UHA been enacted with this quoted language, the City's position, at least with regard to section 2 of Prop H, would have more persuasive bite. However, when the Legislature ultimately enacted the UHA, this language was deleted. (Assem. Amend. to Sen. Bill No. 15 (1999–2000 Reg. Sess.) June 16, 1999.)

Our Supreme Court has cautioned courts not to read too much into deletions from bills when ascertaining legislative intent. (See *American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1261–1262 [23 Cal.Rptr.3d 453, 104 P.3d 813].) However, following passage of the UHA, cities, including San Francisco, repealed their own Saturday Night Special ordinances. We agree with the trial court's conclusion that these repeals were in recognition of "the UHA's preemptive effect on the topic"; and indeed, the City has offered no other explanation for its action.

The City next challenges the trial court's finding that the UHA impliedly preempts section 2 by arguing there can be no conflict with state law because

the UHA simply provides that handguns not found to be unsafe *"may be sold"* in the state. (Pen. Code, § 12131, subd. (a), italics added.) The City contends that the italicized language means only that the UHA allows the sale of those handguns; it does not mandate that local governments permit such sales. Consequently, the mere fact that the Legislature has sanctioned certain handguns for sale does not prohibit a municipality from imposing additional requirements.

We acknowledge courts have found, in the absence of express preemptive language, that a city or county may make additional regulations, different from those established by the state, if not inconsistent with the purpose of the general law. (See, e.g., *Suter, supra,* 57 Cal.App.4th at p. 1116 [finding an ordinance enacted by the City of Lafayette requiring persons seeking to sell, transfer or lease weapons to obtain local land use and police permits was not preempted by state law]); *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 704–709 [209 Cal.Rptr. 682, 693 P.2d 261]; *Northern Cal. Psychiatric Society, supra,* 178 Cal.App.3d at p. 106.) We further acknowledge that, in spite of the UHA's enactment, room has been left by the Legislature for some quantum of local handgun sales regulation. (See, e.g., *Great Western, supra,* 27 Cal.4th at p. 868 [upholding a Los Angeles County ordinance prohibiting the sale of firearms at gun shows on county property against a preemption challenge even though the UHA permits the type of sale barred by the ordinance].)

But, this case is not one where a local entity has legislated in synergy with state law. To the contrary, here the state and local acts are irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. (*Water Quality Assn. v. City of Escondido* (1997) 53 Cal.App.4th 755, 765 [61 Cal.Rptr.2d 878], citing *Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 419–420 [261 Cal.Rptr. 384, 777 P.2d 157].) As the trial court recognized, section 2's ban on the sale of handguns does not merely overlap with the UHA; instead, it "swallows the state regulations whole." The City is not simply imposing additional restrictions on state law to accommodate local concerns; but instead, it has enacted a total ban on an activity state law allows. This difference was recognized in *Great Western,* which noted that total bans are not viewed in the same manner as added regulations, and justify greater scrutiny. (*Great Western, supra,* 27 Cal.4th at pp. 867–888.) Therefore, we agree that with the passage of the UHA, the Legislature has impliedly preempted local ordinances, such as section 2, which completely bans the sale of all handguns.

## F. Cases Addressing Local Regulation of Firearm Sales

We next consider several cases the City claims have "resoundingly upheld local laws that prohibit gun sales, or otherwise restrict access to firearms." The first of these cases, *CRPA, supra,* 66 Cal.App.4th 1302, was decided shortly before the UHA was enacted, and indeed, concerned one of the local ordinances that was the precursor to its passage. In *CRPA,* the Second Appellate District held that a local ordinance which banned, within city limits, the sale of any handgun which the city classified as a Saturday Night Special was not preempted by Government Code section 53071 or Penal Code section 12026. (66 Cal.App.4th at p. 1302.)

The court declined to extend the reasoning of *Doe* to handgun sales, instead finding that "*Doe* identifies only 'residential handgun possession' as a preempted field," and that "[t]he ordinance at issue here creates no permit or license requirement, and instead regulates only sales." (*CRPA, supra,* 66 Cal.App.4th at p. 1319.) Additionally, the opinion concluded that the ban of one specific type of handgun does not conflict with Government Code section 53071's express preemption of the field of registration and licensing. (66 Cal.App.4th at p. 1322.)

Thus, *CRPA* concluded that cities had some leeway to ban the sale of one particular type of gun deemed to present dangers to a local community above and beyond the dangers presented by handguns generally. However, that decision does not stand for the principle that municipalities are free to ban the sale of *all* firearms. The *CRPA* court was careful to make this distinction, emphasizing that "[t]he ordinance involved in the instant case does not ban possession of any handgun, but instead bans the sale of a limited category of handguns within city limits." (*CRPA, supra,* 66 Cal.App.4th at pp. 1321–1322.) That clearly is inapposite to the facts of this case.

Moreover, at the time *CRPA* was decided there was " 'no [statutory] prohibition on, nor any express authorization for, the sale of Saturday night specials or other concealable firearms' " that would pose a potential conflict with a local ordinance prohibiting the sale of Saturday Night Specials. (*CRPA, supra,* 66 Cal.App.4th at p. 1322.) Shortly after *CRPA* was decided, the regulatory landscape relating to handgun sales was significantly altered when the Legislature passed the UHA. Thus, the court that decided *CRPA* had no opportunity to determine to what extent the UHA preempts local authority in

the area of handgun sales, rendering *CRPA*'s analysis of dubious precedential value.

Finally, we consider a brace of recent cases decided by our Supreme Court, which the City argues supports its authority to ban the sale of firearms and ammunition. Answering questions certified from the United States Court of Appeals for the Ninth Circuit, the California Supreme Court held in two companion cases that a county ordinance that prohibited the sale of firearms and ammunition at gun shows held on county property was not preempted by state law. (*Great Western, supra*, 27 Cal.4th 853; see *Nordyke v. King* (2002) 27 Cal.4th 875 [118 Cal.Rptr.2d 761, 44 P.3d 133] (*Nordyke*).) Unlike the broader preemption question here, the question addressed by the Supreme Court was whether the Legislature intended to occupy the entire field of gun show regulation, including controlling the venues for such shows. The court answered this question in the negative, perceiving nothing in state law that expressly or impliedly prohibited a county from withdrawing its property from use for gun shows, based on its own calculation of the costs and benefits of permitting such use. The court emphasized that California law regulating activities at gun shows did not "mandate that counties use their property for such shows." (*Great Western, supra*, 27 Cal.4th at p. 870; see *Nordyke, supra*, 27 Cal.4th at p. 884.)

The Supreme Court also held that, contrary to the claims of the gun show promoters, the local ordinances did not contradict state firearms law by promoting something prohibited by the state or by prohibiting something promoted by the state. "[T]here is no evidence in either the gun show statutes[, Penal Code sections 12071, 12071.1 and 12071.4,] or, as far as we can determine, in their legislative history, that indicates a stated purpose of promoting or encouraging gun shows." (*Great Western, supra*, 27 Cal.4th at p. 868.) The court went on to hold that "[T]he overarching purpose of [the Penal Code sections] appears to be nothing more than to acknowledge that such shows take place and to regulate them to promote public safety." (*Ibid.*) The court also pointed out that the statutes governing gun shows contemplate that firearm dealers at gun shows will be subject to applicable local regulations. (See Pen. Code, § 12071.4 [subjecting gun shows to local regulation].) (*Great Western, supra*, 27 Cal.4th at p. 865.) Accordingly, the county had the authority to prohibit the operation of gun shows held on its property and, at least to that extent, could "impose more stringent restrictions on the sale of firearms than state law prescribes." (*Id.* at p. 870.)

These cases are palpably distinguishable from the case before us. In deciding *Great Western* and *Nordyke,* our Supreme Court was careful to confine its preemption analysis to the question of whether state law authorizing gun shows necessarily compelled counties to allow their property to be

used for this purpose. (*Great Western, supra*, 27 Cal.4th at p. 858; *Nordyke, supra*, 27 Cal.4th at p. 884.) The court found that there was acceptable interplay between the local government's exercise of its power to control the use of its property and the state government's regulation of gun shows to permit local governments to ban the sale of firearms and ammunition at gun shows on county-owned public property. (*Great Western, supra*, 27 Cal.4th at p. 869; *Nordyke, supra*, 27 Cal.4th at p. 885.) Neither case can be properly read to extend that limited preemption inquiry to a case such as this one involving a local government's attempt to enact an absolute and total ban of firearm and ammunition sales on all property, public and private, within its geographic jurisdiction.

In conclusion, we find the situations presented in *CRPA, supra*, 66 Cal.App.4th 1302, *Great Western, supra*, 27 Cal.4th 853, and *Nordyke, supra*, 27 Cal.4th 875, are so different from those presented in this case as to make them inapposite here.

### G.  Statewide Concern or Municipal Affair?

■  Despite having found preemption, the City can nevertheless escape petitioners' challenge if Prop. H relates to a purely "municipal affair," because its city charter includes a "home rule" provision. (*Bishop v. City of San Jose* (1969) 1 Cal.3d 56, 61 [81 Cal.Rptr. 465, 460 P.2d 137].) But "[a]s to matters which are of statewide concern, however, home rule charter cities remain subject to and controlled by applicable general state laws regardless of the provisions of their charters, if it is the intent and purpose of such general laws to occupy the field to the exclusion of municipal regulation (the preemption doctrine). [Citations.]" (*Id.* at pp. 61–62.)

Our Supreme Court also addressed this issue in its recent *O'Connell* case. There, the City of Stockton argued that even if its ordinance authorizing forfeiture of vehicles used in the commission of certain criminal acts was preempted by state law, it was lawful because the subject matter of the ordinance constituted a "municipal affair," and did not involve a matter of "statewide concern." (*O'Connell, supra*, 41 Cal.4th at pp. 1075–1076.) The Supreme Court summarily rejected that argument in *O'Connell*, noting that the illegal activities at issue, prostitution and trafficking in controlled substances, had been "comprehensively addressed through various provisions of this state's Penal and Vehicle Codes, leaving no room for further regulation at the local level," and therefore were "matters of statewide concern." (*Id.* at p. 1076.)

■  We likewise have reason to reject summarily the City's argument that Prop. H addresses only a municipal affair. When looked at as a whole, the

Penal Code presents a comprehensive montage of firearms possession, sale, licensing, and registration laws complete with detailed exceptions and exemptions. These laws of statewide application reflect the Legislature's balancing of interests—on the one side the interest of the general public to be protected from the criminal misuse of firearms, on the other, the interests of law-abiding citizens to be able to purchase and use firearms to deter crime, to help police fight crime, to defend themselves, and for hunting and certain recreational purposes. If every city and county were able to opt out of the statutory regime simply by passing a local ordinance, the statewide goal of uniform regulation of handgun possession, licensing, and sales would surely be frustrated. Clearly, the creation of a *uniform* regulatory scheme is a matter of statewide concern, which should not be disrupted by permitting this type of contradictory local action. (See *Long Beach Police Officers Assn. v. City of Long Beach* (1976) 61 Cal.App.3d 364 [132 Cal.Rptr. 348].)

## H. Conclusion

We, therefore, affirm the trial court's conclusion that Prop. H is invalid as preempted by state law. As the City repeatedly emphasizes, the statutes governing firearms have been "carefully worded to avoid any broad preemptive effect." (*CRPA, supra*, 66 Cal.App.4th at p. 1314.) Nevertheless, the sheer breadth of Prop. H makes it vulnerable to a preemption challenge. As already noted, section 2 of Prop. H bans the "*sale*, manufacture, transfer or distribution" of ammunition and firearms in the City, without exception. (Italics added.) With narrow exceptions, section 3 bans the *possession* of handguns by San Francisco residents, including possession within the sanctity of homes, businesses, and private property. (Italics added.)[9]

We wish to stress that the goal of any local authority wishing to legislate in the area of gun control should be to accommodate the local interest with the least possible interference with state law. As we have seen, while courts have tolerated subtle local encroachment into the field of firearms regulation (*CRPA, Great Western, Nordyke*), laws which significantly intrude upon the state prerogative have been uniformly struck down as preempted (*Doe, Sippel*). Therefore, when it comes to regulating firearms, local governments are well advised to tread lightly. (See *California Dreamin'*, *supra*, 30 U.S.F. L.Rev. 395.)

---

[9] Section 7 of the ordinance contains a severability clause, and the City asks that we parse the ordinance to save what we can. Specifically, the City claims that Prop. H's ban on the sale and possession of rifles and shotguns, which is intermingled with the ban on handguns, can survive. The ordinance at issue requires extensive revision if there is any hope of bringing it into conformance with state law, and the rewriting is more appropriately done by the City than by this court. (See *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 173 [130 Cal.Rptr. 465, 550 P.2d 1001].)

## IV.

## DISPOSITION

The judgment is affirmed. Petitioners are entitled to their costs on appeal.

Reardon, J., and Sepulveda, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 9, 2008, S160968.